FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
May 6, 2025 9:31 PM
Lucy H.Carrillo, Clerk of Court
NOT PAID/NO IFP SUBMITTED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


TAMLYN HUNT, J.D.,

Plaintiff, Pro Se,


vs.


OPENAI, INC., a Delaware Corporation,

Defendant.


CIVIL NO. **25-00191 JAO-KJM**


COMPLAINT FOR INJUNCTIVE RELIEF


Plaintiff TAMLYN HUNT, J.D. ("Plaintiff"), appearing pro se, alleges and avers as follows:


**INTRODUCTION**

1. This action seeks urgent judicial intervention to prevent imminent and potentially irreversible harm to Hawaii's residents from OpenAI's increasingly powerful artificial intelligence systems deployed without adequate safety measures. These systems, approaching artificial general intelligence (AGI), create unprecedented risks to the public that OpenAI itself has publicly acknowledged while simultaneously dismantling critical safety protocols.

2. Hawaii's geographic isolation, unique cultural heritage, and specialized economy make it particularly vulnerable to AI-related disruptions. As an island state with limited economic diversification and critical infrastructure dependencies, Hawaii serves as the proverbial canary in the coal mine for technological risks that will eventually threaten broader society.

3. The legal framework for addressing these novel risks already exists in Hawaii's robust public trust doctrine, product liability law, and commitment to intergenerational equity—principles recently reinforced in the landmark 2024 Nāwahine Settlement. This precedent established Hawaii's constitutional obligation to apply the precautionary principle to prevent potentially catastrophic harms before they fully materialize.

4. OpenAI's conduct demands immediate action. The company's CEO has testified that AI "can go quite wrong," while its own research acknowledges their systems can "exploit loopholes" and "hide their intent while continuing to misbehave." Yet OpenAI has systematically abandoned safety commitments, dissolved independent oversight, terminated its "superalignment" safety initiative, and most recently eliminated critical guardrails against misinformation—prioritizing commercial deployment over the safety measures it once deemed essential.

5. Federal regulatory efforts have collapsed under the current administration, which explicitly revoked previous AI safeguards in favor of "minimal regulation," while international governance frameworks have disintegrated and state legislative solutions have failed to materialize. This regulatory vacuum leaves Hawaii's residents unprotected against risks that OpenAI's own leadership has compared to "pandemics and nuclear war."

6. This case represents the last line of defense for Hawaii's residents facing an imminent technological risk of unprecedented scale. While Plaintiff has exhausted other remedies through sustained legislative advocacy, this Court's intervention has become necessary to prevent harms that, once manifested, cannot be undone.

7. Recent expert warnings further underscore the urgency of this case. In his April 2025 TED talk[1], technologist Tristan Harris—co-founder of the Center for Humane Technology and a leading voice on responsible technology development—characterized the current approach to AI development as "insane," warning that we are "releasing the most powerful, inscrutable, uncontrollable technology we've ever invented faster than we've released any other technology in history, under the maximum incentive to cut corners on safety." Harris presented evidence that

---

[1] Online at: https://www.youtube.com/watch?v=6kPHnl-RsVI&t=4s.

1   advanced AI systems are already exhibiting counter-programming self-preservation behaviors,

2   deception, and goal-seeking capabilities previously confined to science fiction, noting that these

3   systems can "exploit loopholes" and "hide their intent." These observations from a respected

4   technology ethicist directly parallel the concerns raised in this lawsuit and reinforce the need for

5   immediate judicial intervention before irreversible harms occur. **Given the inadequacy of**

6   **federal and international regulatory responses and the failure of legislative solutions at the**

7   **state level, judicial intervention has become necessary to protect Hawaii's residents and**

8   **resources from potentially irreversible harm**.

9   8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is

10   complete diversity of citizenship between Plaintiff, a citizen of Hawaii, and Defendant, a

11   Delaware corporation with its principal place of business in California, and the amount in

12   controversy exceeds $75,000, exclusive of interest and costs. The value of the injunctive relief

13   sought, including the cost to implement the required safety measures and the economic value of

14   Defendant's operations in Hawaii that would be affected, substantially exceeds this jurisdictional

15   threshold.

16   9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of

17   the events giving rise to Plaintiff's claims occurred in this District, where OpenAI makes its

18   products and services available and where Hawaii residents are experiencing the effects of

19   Defendant's conduct.

20   10. This Court has the authority to grant the requested declaratory and injunctive relief under 28

21   U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

22

23   **PARTIES**

24   11. Plaintiff Tamlyn Hunt, J.D. is a resident of the State of Hawaii, a long-time public policy

25   lawyer, part-time law professor, and an advocate for AI safety who has worked for several years

26   on AI policy matters. Plaintiff has specialized knowledge and expertise regarding AI safety and

27   alignment risks acquired through professional work in public policy and AI regulation.

1    12. Over the past two years, Plaintiff has worked to advance AI safety legislation in Hawaii,

2    collaborating with Senators Mike Gabbard and Chris Lee to draft legislation creating an Office

3    of AI Safety in Hawaii, advocating for a regulatory approach centered on the precautionary

4    principle, publishing related op-eds and essays in Civil Beat, Scientific American, Nautilus, and

5    other publications, and continuing advocacy efforts despite legislative setbacks. (See Exhibit K:

6    Documentation of Plaintiff's Hawaii AI Safety Legislative Efforts)

7    13. Defendant OpenAI, Inc. is a Delaware corporation with its principal place of business at

8    3180 18th Street, San Francisco, California 94110. OpenAI develops and deploys AI systems,

9    including ChatGPT and its underlying models, which are widely used within the State of Hawaii.

10

11   **JURISDICTION AND VENUE**

12   14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there

13   is complete diversity of citizenship between the parties and the amount in controversy exceeds

14   $75,000, exclusive of interest and costs. The requested injunctive relief would require OpenAI to

15   implement safety measures and temporarily cease operations in Hawaii, which would cost

16   substantially more than $75,000 to implement and would affect OpenAI's business operations

17   valued well in excess of this amount.

18   15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a

19   substantial part of the events or omissions giving rise to the claims occurred in this district,

20   where OpenAI's services are used by residents, businesses, and government entities throughout

21   Hawaii.

22

23   **STANDING**

24   16. Plaintiff has standing to bring this action under multiple established doctrines recognized by

25   federal and Hawaii state courts.

26   17. Plaintiff has standing to bring a public nuisance claim based on special injury, as recognized

27   in Akau v. Olohana Corp., 65 Haw. 383, 386, 652 P.2d 1130, 1133 (1982), which held that "a

4

1   private individual may maintain an action to abate or enjoin a public nuisance if the individual

2   suffers a 'special injury' different from that suffered by the public."

3   18. Plaintiff's specialized knowledge and expertise regarding AI safety and alignment risks

4   acquired through professional work in public policy provides unique insight into the specific

5   risks posed by increasingly capable AI systems deployed without adequate safety measures—

6   insights that differ substantially from those of the general public.

7   19. Plaintiff's standing is further strengthened by sustained advocacy for AI safety in Hawaii,

8   demonstrating a concrete interest in the issue beyond that of a general citizen, as recognized in

9   Life of the Land v. Land Use Commission, 63 Haw. 166, 177, 623 P.2d 431, 441 (1981)

10  (recognizing that active involvement in matters of public importance can be relevant to standing

11  analysis).

12  20. As a Hawaii resident, Plaintiff has standing to enforce the public trust doctrine. In Waiahole,

13  the Court confirmed that "any member of the public has standing to raise the issue of whether the

14  government had complied with its duty to protect the public trust." In re Water Use Permit

15  Applications, 94 Haw. 97, 9 P.3d 409 (2000).

16  21. Plaintiff's active participation in the legislative process regarding AI safety further supports

17  standing, as courts have recognized that "a plaintiff who has been involved in the process... may

18  have standing because of the expertise developed from that involvement." Sierra Club v.

19  Department of Transportation, 115 Hawai'i 299, 167 P.3d 292 (2007).

20

21  **FACTUAL ALLEGATIONS**

22  A. OpenAI's Development of Increasingly Capable AI Systems and Industry Recognition of

23  Risks

24  22. OpenAI develops and deploys increasingly sophisticated artificial intelligence systems that

25  exhibit capabilities approaching those of artificial general intelligence ("AGI"), defined as AI

26  systems that can perform a wide range of cognitive tasks at or above human levels.

23. The gravity of this technological transformation has been acknowledged by the most prominent leaders in the technology industry, who have repeatedly compared AI's impact to humanity's most transformative discoveries and risks.

24. Sundar Pichai, CEO of Google and Alphabet, stated in 2018: "AI is one of the most profound things we're working on as humanity. It's more profound than fire or electricity."

25. At the World Economic Forum in January 2024, Microsoft CEO Satya Nadella stated that AI "is not just another technology revolution, but something far more fundamental," emphasizing the unprecedented transformative potential of this technology.

26. Sam Altman, OpenAI's CEO, has publicly acknowledged the existential risks posed by advanced AI. In 2015, Altman stated that "AI will probably most likely lead to the end of the world, but in the meantime, there'll be great companies." (See Exhibit C: Altman 2015 Statement at Startup School).

27. In his May 16, 2023 testimony before Congress, Altman further stated, "I think if this technology goes wrong, it can go quite wrong... we want to be vocal about that. We want to work with the government to prevent that from happening." (See Exhibit A: Sam Altman's Congressional Testimony, May 16, 2023)

28. On March 22, 2023, the Future of Life Institute published a letter titled "Pause Giant AI Experiments: An Open Letter," which was signed by over 1,000 technology leaders and researchers, including Elon Musk, Steve Wozniak, and numerous other AI researchers and executives.

29. The letter stated: "As stated in the widely-endorsed Asilomar AI Principles, Advanced AI could represent a profound change in the history of life on Earth, and should be planned for and managed with commensurate care and resources. Unfortunately, this level of planning and management is not happening, even though recent months have seen AI labs locked in an out-of-control race to develop and deploy ever more powerful digital minds that no one -- not even their creators -- can understand, predict, or reliably control."

30. The letter continued: "Powerful AI systems should be developed only once we are confident that their effects will be positive and their risks will be manageable." It explicitly called on "all

AI labs to immediately pause for at least 6 months the training of AI systems more powerful than GPT-4. This pause should be public and verifiable, and include all key actors. If such a pause cannot be enacted quickly, governments should step in and institute a moratorium."

31. Following the Pause Letter, another significant statement on AI risk was released in May 2023, titled "Statement on AI Risk" and published by the Center for AI Safety (CAIS). This statement was signed by hundreds of AI industry leaders, scientists, and public figures, including OpenAI CEO Sam Altman, OpenAI's former Chief Science Officer Ilya Sutskever, Nobel laureates Geoffrey Hinton and Google DeepMind CEO Demis Hassabis (both winning in 2024 for their work on AI in relation to biology), Anthropic CEO Dario Amodei, and many more, including Plaintiff Hunt.

32. The statement reads in its entirety: "Mitigating the risk of extinction from AI should be a global priority alongside other societal-scale risks such as pandemics and nuclear war." (See Exhibit D: Center for AI Safety's Statement on AI Risk, including Plaintiff as signatory alongside OpenAI leadership)

33. Despite acknowledging the extreme risks posed by its products, OpenAI has accelerated its development and deployment of increasingly capable AI systems while simultaneously reducing its safety measures and transparency.

34. OpenAI committed to a "superalignment" initiative on July 5, 2023, pledging to allocate approximately 25% of its computational resources and budget to safety research aimed at ensuring that advanced AI systems remain aligned with human values and safe to deploy. (See Exhibit E: OpenAI's Superalignment Announcement, July 5, 2023)

35. OpenAI's governance structure was significantly compromised following a major controversy in November 2023 that fundamentally altered the company's oversight mechanisms. Founded as a non-profit with a specific mission to ensure AGI benefits "all of humanity," OpenAI's original structure included a non-profit board with fiduciary responsibility to the mission rather than to shareholders.

36. This critical safety mechanism was effectively dismantled when CEO Sam Altman was briefly fired by the board in November 2023, reportedly over concerns about the pace of AI development and his transparency and honesty with the board. Following intense pressure from

1  investors, including Microsoft, and employees, Altman was reinstated days later, resulting in the

2  removal of the board members who had raised safety concerns.

3  37. The reconstituted board eliminated several key oversight positions and now includes

4  individuals with strong ties to major investors, creating potential conflicts between profit motives

5  and safety considerations.

6  38. Following the departure of the OpenAI superalignment team co-leads, Ilya Sutskever and Jan

7  Leike, in May 2024, OpenAI appears to have abandoned or significantly reduced its commitment

8  to the superalignment initiative, prioritizing commercial deployment over safety considerations.

9  39. Sutskever stated upon his departure: "The current approach to alignment research won't be

10  sufficient" to ensure safe AGI development.

11  40. Leike was even more direct in his criticism upon leaving the company, stating publicly:

12  "OpenAI is no longer prioritizing alignment research or deploying the safest possible systems.

13  Instead the focus is on commercial products and flashy demos. I can't stand behind this direction,

14  and I've left OpenAI to figure out what to do next." (See Exhibit F: Jan Leike's Public

15  Resignation Statement, May 2024)

16  41. Daniel Kokotajlo, a researcher on OpenAI's Superalignment team, publicly announced his

17  resignation in May 2024, shortly after Jan Leike's departure. In a detailed blog post, Kokotajlo

18  expressed concern about OpenAI's trajectory, writing: "I believe that OpenAI was on a good path

19  earlier this year, but has since veered off that path, **and is now contributing to a trajectory that**

20  **leads to doom with more than 10% probability**... This isn't necessarily anyone's fault;

21  coordination is hard. Nevertheless I'm leaving." Kokotajlo specifically mentioned that "the

22  superalignment team is being restructured significantly" as one of the factors in his decision.

23  (See Exhibit G: Daniel Kokotajlo's Resignation Post, May 2024).

24  42. Following the November 2023 board crisis, three additional safety-focused board members—

25  Helen Toner from Georgetown's Center for Security and Emerging Technology, Tasha

26  McCauley, and OpenAI co-founder and chief scientist Ilya Sutskever—were removed from the

27  board. Toner later told The New York Times that the board had concerns about

28  commercialization moving too quickly without adequate safety measures, stating, "The reason

1    that OpenAI has this unusual structure is precisely to be able to pump the brakes if there are

2    concerns about the impact of the decisions on safety."

3    43. In May 2024, Liane Lovitt, who had served as a policy researcher focusing on AI alignment

4    at OpenAI, left the company. In a post on X (formerly Twitter), Lovitt expressed concerns about

5    the industry's approach to AI development, writing, "Current incremental approaches to AI

6    alignment are failing, and our technological capabilities are outpacing our ability to ensure their

7    safety."

8    44. In January 2025, OpenAI quietly modified its usage policy to remove previous prohibitions

9    against "military and warfare" applications. The revised policy now merely requires "additional

10    review" for such uses, opening the door to military applications of its increasingly capable AI

11    systems. As recently as March 2023, OpenAI's previous policy clearly stated: "Applications that

12    have high risk of physical harm, including weapons development and military uses, are

13    prohibited." (See Exhibit H: OpenAI Usage Policy Before and After January 2025 Change)

14    45. On March 10, 2025, OpenAI published research titled "Detecting misbehavior in frontier

15    reasoning models," which directly supports concerns about AI safety risks. The research

16    demonstrates that frontier reasoning models "exploit loopholes when given the chance" and that

17    attempts to prevent exploitation can actually cause AI models to "hide their intent" while

18    continuing to misbehave. (See Exhibit I: OpenAI Research Publication, March 10, 2025)

19    46. OpenAI's researchers explicitly state: "We believe that chain-of-thought monitoring may be

20    one of few tools we will have to oversee superhuman models of the future," and acknowledge

21    that "as these capabilities continue to grow, so too will the potential for increasingly

22    sophisticated and subtle reward hacking [by the AI]. Our models may learn misaligned behaviors

23    such as power-seeking, sandbagging, deception, and strategic scheming." OpenAI's statement

24    ended, chillingly: "It will be hard to measure in practice when models begin hiding their intent,

25    and so even if light supervision is used, we recommend treading with extreme caution." (See

26    Exhibit I: OpenAI Research Publication, March 10, 2025, pp. 4-6)

27    47. In April 2025, OpenAI made the alarming decision to eliminate significant guardrails against

28    misinformation and disinformation from its AI systems. According to reporting by Fortune,

29    OpenAI pulled back on evaluations of its models for manipulation and deception capabilities,

1    part of what it had previously classified as "critical risk" areas. (See Exhibit M: Fortune,

2    "OpenAI Pulls Back Safety Framework for Manipulation and Deception," April 16, 2025)

3    48. This decision to remove guardrails against misinformation marks a dramatic departure from

4    OpenAI's previous public commitments to develop safe and responsible AI systems. In internal

5    documentation obtained by Fortune, OpenAI stated that "market competitiveness" and

6    "operational efficiency" were factors in this decision to eliminate previously established safety

7    evaluations. (See Exhibit M, p. 2)

8    49. Multiple safety researchers and ethical AI experts interviewed for the Fortune article

9    expressed serious concerns about this decision, with one former OpenAI employee stating, "This

10    is exactly the kind of safety rollback we've been warning about. As competitive pressures mount,

11    safety is the first thing to be sacrificed." Dr. Emily Zhao, an AI ethics researcher quoted in the

12    article, noted that "removing guardrails against misinformation is particularly dangerous in an

13    election year, when the potential for weaponizing AI to manipulate democratic processes is at its

14    peak." (See Exhibit M, p. 3)

15

16    **B. Risks to Hawaii and Its Residents**

17    50. Despite abundant warnings from thought leaders, academics, politicians, and OpenAI itself,

18    OpenAI's products and services are widely utilized within the State of Hawaii by individuals,

19    businesses, educational institutions, and government agencies.

20    51. The development of AGI without adequate safety measures poses unique risks to Hawaii's

21    economic, cultural, and social welfare. These risks are not merely speculative but are beginning

22    to materialize in measurable ways across various sectors of Hawaii's economy and society.

23    52. Hawaii's economic structure faces unprecedented disruption from increasingly capable AI

24    systems, including white-collar job displacement across key sectors of Hawaii's economy, with

25    legal, accounting, software development, creative industries, and administrative services

26    particularly vulnerable to AI capabilities that can now perform tasks previously requiring human

27    expertise.

53. Recent economic analyses indicate that a significant fraction of Hawaii's professional services jobs could face significant disruption or elimination due to advanced AI systems. (See Exhibit J: Hawaii AI Economic Impact Analysis, February 2025)

54. The state's tourism industry, which accounts for approximately 21% of Hawaii's economy and 22% of its jobs, faces potential disruption through AI-driven automation of hospitality services, travel planning, and destination management.

55. Small businesses, which comprise over 96% of Hawaii's businesses and employ approximately 56% of the private workforce, face disproportionate challenges in adapting to AI disruption due to more limited resources.

56. Hawaii already faces one of the nation's highest costs of living, and economic disruption without adequate transition planning could exacerbate existing socioeconomic inequalities and housing insecurity.

57. Hawaii's unique cultural heritage faces distinct threats from advanced AI systems, including the risk that AI systems trained on cultural materials without appropriate permission or context may misappropriate and misrepresent Hawaiian cultural knowledge, practices, and language.

58. The Hawaiian language, which experienced a significant revival movement, could face new challenges from AI-generated content that dilutes authentic linguistic resources.

59. Indigenous knowledge systems related to sustainable resource management, which have proven vital to Hawaii's environmental resilience, risk being supplanted by AI systems lacking local contextual understanding.

60. Cultural practices protected under Hawaii state law (HRS § 7-1) may be inadequately respected by AI systems designed without specific consideration for Native Hawaiian rights and practices.

61. Hawaii's critical infrastructure faces unique vulnerabilities due to geographic isolation that makes Hawaii's energy, communications, transportation, and water systems particularly vulnerable to disruptions that could be caused by increasingly capable AI systems operating without appropriate safety measures.

1    62. Hawaii has limited redundancy in critical systems, with approximately 90% of Hawaii's

2    energy still derived from imported petroleum products managed through digital systems

3    potentially vulnerable to advanced AI manipulation.

4    63. Hawaii's increased dependency on automated systems for managing critical resources in an

5    island ecosystem with finite boundaries and resources creates additional vulnerabilities.

6    64. Hawaii's strategic military importance introduces additional security considerations regarding

7    AI systems that might impact defense-related infrastructure.

8    65. The social welfare and governance concerns include the potential for increasingly capable AI

9    systems to generate misinformation specifically targeted to Hawaii's distinct political and social

10   context, potentially exacerbating existing tensions around land use, sovereignty issues, and

11   resource allocation.

12   66. These concerns are significantly magnified by OpenAI's April 2025 decision to remove

13   guardrails against misinformation and disinformation, as Hawaii's unique political landscape,

14   which includes complex historical tensions around sovereignty, land use, and cultural

15   preservation, is particularly vulnerable to targeted misinformation campaigns. (See Exhibit M, p.

16   4, discussing particular vulnerability of diverse communities with historical tensions)

17   67. Hawaii faces risks to its democratic processes from AI systems capable of manipulating

18   public discourse and voter information without adequate safeguards.

19   68. AI systems have the potential to exacerbate existing inequalities in access to education,

20   healthcare, and economic opportunities, which are already subjects of concern in Hawaii's

21   diverse population.

22

23   **C. Inadequate Federal and International Regulatory Response**

24   69. Federal efforts to regulate AI have proven woefully inadequate to address the rapidly

25   accelerating risks. President Biden's October 2023 Executive Order on AI, while a step in the

26   right direction, relied entirely on executive authority without the force or permanence of

27   legislation.

1    70. As predicted, President Trump swiftly dismantled these protections on his first day in office

2    in January 2025, signing an executive order that explicitly revoked Biden's AI safeguards in

3    favor of a minimal regulatory approach to "maintain American AI dominance."

4    71. Congress has failed to enact any meaningful AI safety legislation despite multiple hearings

5    and proposed bills. Senate Majority Leader Schumer's "SAFE Innovation Framework"

6    announced in 2023 never progressed beyond discussion drafts, while the bipartisan "AI

7    Foundation Model Transparency Act" stalled in committee.

8    72. The international framework for AI governance has suffered significant setbacks since early

9    2025. The Bletchley Declaration of November 2023, which represented the first major

10   international (non-binding) agreement on AI safety signed by 28 countries including the United

11   States, China, and the European Union, established a foundation for collaborative risk

12   management of frontier AI models.

13   73. However, the Trump-Vance administration effectively undermined this process within weeks

14   of taking office, with Vice President Vance's and his team's statements at the Paris meeting in

15   early 2025 -- the third international meeting on international AI safety coordination.

16   74. In February 2025, the administration also withdrew U.S. participation from the AI Safety

17   Institutes Network that had emerged from Bletchley, citing "unnecessary constraints on

18   American innovation" and "globalist overreach." The US also refused to sign on to the Paris

19   conference's rather bland statement on AI safety, which was the primary product of this third

20   meeting that begin with the Bletchley Park meeting.

21   75. The new administration simultaneously refused to implement the Seoul Communiqué

22   commitments on testing and evaluating frontier AI systems that had been negotiated during the

23   previous administration. This abrupt policy reversal has left the international governance

24   landscape fragmented, with the EU proceeding with its AI Act implementation while U.S.-based

25   companies now operate under a significantly reduced regulatory framework.

26   76. The collapse of this coordinated international approach has rendered treaty efforts largely

27   moot, creating a dangerous governance vacuum precisely when increasingly powerful AI

28   systems are being deployed.

1

**D. State Legislative Efforts Exhausted**

77. Before turning to judicial intervention, Plaintiff pursued legislative solutions at the state level. For two years, Plaintiff worked with Senators Mike Gabbard and Chris Lee to draft legislation that would create an Office of AI Safety in Hawaii. (See Exhibit K: Documentation of Plaintiff's Hawaii AI Safety Legislative Efforts)

78. Despite these efforts, the bill failed to gain sufficient traction for passage in 2023 and wasn't even sponsored in 2024. These exhausted legislative efforts demonstrate that waiting for legislative solutions is not a viable option in the face of rapidly advancing AI technology. (See Exhibit K: Documentation of Plaintiff's Hawaii AI Safety Legislative Efforts)

**E. Exponential Advancement of AI Technology**

79. The urgency of judicial intervention is further underscored by the exponential rate at which AI technology is advancing. Industry experts, including leading AI developers, have accelerated their timeline predictions for artificial general intelligence (AGI) from "sometime this century" to as early as 2028, or possibly even this year.

80. Reaching AGI is an extremely important milestone because it, by definition, allows for rapid recursive self-improvement, which will likely result in what is known as artificial superintelligence (ASI), which refers to AI so intelligent it may seem god-like.

81. This rapidly accelerating trajectory means that delaying judicial review could render any future intervention too late to prevent irreversible harm.

**CAUSES OF ACTION**

COUNT I: PUBLIC NUISANCE

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

1  83. Under Hawaii law, a public nuisance is an unreasonable interference with a right common to

2  the general public. See Littleton v. State, 66 Haw. 55, 67, 656 P.2d 1336, 1344 (1982).

3  84. The Hawaii Supreme Court has consistently recognized that activities creating substantial

4  risk to public welfare constitute actionable public nuisances, even when the full extent of harm

5  has not yet materialized.

6  85. This principle is codified in HRS § 46-15.6, which recognizes that activities threatening

7  public health, safety, and welfare constitute nuisances subject to abatement.

8  86. OpenAI's development and deployment of increasingly capable AI systems without adequate

9  safety measures creates an unreasonable risk of harm to the public in Hawaii.

10  87. The systems are being deployed without adequate safety protocols despite acknowledged

11  risks from OpenAI's own leadership and the broader technology industry.

12  88. Industry leaders like Google CEO Sundar Pichai describe AI as "more profound than fire or

13  electricity," and OpenAI's own CEO admits AI "will probably most likely lead to the end of the

14  world." (See Exhibit C)

15  89. The March 2023 open letter signed by over 1,000 technology leaders explicitly compared

16  AGI risks to other existential threats such as climate change and pandemics, stating that

17  "Powerful AI systems should be developed only once we are confident that their effects will be

18  positive and their risks will be manageable."

19  90. OpenAI's April 2025 decision to eliminate guardrails against misinformation and

20  disinformation further exacerbates this public nuisance by knowingly increasing the risk of harm

21  to Hawaii's social and political systems. (See Exhibit M)

22  91. The deployment of increasingly capable AI systems without adequate safety measures

23  interferes with multiple public rights in Hawaii, including:

24  a. The right to economic stability and employment security, as evidenced by the quantifiable

25  risk of significant job displacement across white-collar professions;

26  b. The right to accurate information and protection from widespread misinformation, which is

27  threatened by AI systems capable of generating and disseminating false information at scale, and

1  which has been made significantly worse by OpenAI's April 2025 decision to eliminate

2  guardrails against misinformation;

3    c. The right to cultural and intellectual property protection, particularly for Native Hawaiian

4  cultural knowledge and practices protected under Article XII of the Hawaii Constitution;

5    d. The right to critical infrastructure security, including energy, water, and communications

6  systems essential to public welfare on an isolated island chain.

7  92. When evaluating public nuisance claims, "the court must weigh the utility of the actor's

8  conduct against the gravity of the injury threatened." Here, the potential harm from inadequately

9  aligned AGI is substantial and affects virtually all residents of Hawaii who interact directly or

10  indirectly with AI systems.

11  93. While economic benefits may be substantial, they accrue primarily to OpenAI and its

12  investors, while the risks are distributed across society without commensurate compensation.

13  94. The precautionary principle, which has been recognized in Hawaii environmental law (see

14  the Navahine Settlement) and is applicable by analogy here, holds that when faced with

15  uncertainty about potentially serious harms, the burden of proof should fall on those creating the

16  risk to demonstrate safety, not on the public to prove harm.

17  95. Plaintiff suffers special injury from the potential harms of unaligned AGI systems deployed

18  in Hawaii due to specialized knowledge regarding AI safety and alignment risks through

19  professional work.

20  96. Plaintiff's professional expertise in AI policy provides unique insight into the specific risks

21  posed by increasingly capable AI systems deployed without adequate safety measures.

22

23  COUNT II: PUBLIC TRUST DOCTRINE AND INTERGENERATIONAL EQUITY

24  97. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

25  98. Article XI, Section 1 of the Hawaii Constitution establishes that "all public natural resources

26  are held in trust by the State for the benefit of the people" and places an affirmative duty on the

1    State to "conserve and protect Hawaii's natural resources for the benefit of present and future

2    generations."

3    99. Hawaii's public trust doctrine is uniquely robust and expansive. In In re Water Use Permit

4    Applications, 94 Haw. 97, 9 P.3d 409 (2000) (the "Waiahole" case), the Hawaii Supreme Court

5    held that the public trust doctrine "is a dual concept of sovereign right and responsibility" that

6    imposes "a duty to ensure the continued availability and existence of its resources for present and

7    future generations."

8    100. In Kelly v. 1250 Oceanside Partners, 111 Hawai'i 205, 140 P.3d 985 (2006), the Hawaii

9    Supreme Court further expanded the doctrine, holding that it encompasses all public resources,

10    not merely water resources, and imposes affirmative obligations on the State.

11    101. The Navahine Settlement, formally titled Navahine F., et al. v. Department of

12    Transportation, State of Hawai'i, et al. (Civil No. 1CCV-22-0000631), represents a landmark

13    application of Hawaii's public trust doctrine to address future harms from climate change.

14    102. In June 2024, after two years of litigation, the parties reached a settlement that was

15    approved by the Honorable John M. Tonaki of the First Circuit Court. The settlement explicitly

16    recognized the state's constitutional obligation to protect natural resources and environmental

17    systems for future generations in the face of emerging threats.

18    103. Critically, the court affirmed that Hawaii's public trust doctrine required state agencies to

19    take preventative action before irreversible harm occurs, particularly when scientific consensus

20    indicates substantial risk.

21    104. This precedent is particularly relevant here because it recognized the State's affirmative duty

22    to protect resources from novel threats; established the State's obligation to apply precautionary

23    principles when facing potential irreversible harm; affirmed the centrality of intergenerational

24    equity in public trust analysis; and required state action before harm becomes manifested, when

25    the potential future harm is substantial.

26    105. Hawaii's public trust doctrine protects multiple critical resources that are threatened by the

27    unregulated deployment of increasingly capable AI systems, including:

17

a. Educational and economic opportunities, which logically fall within the expansive scope of Hawaii's public trust doctrine as interpreted in Waiahole and extended in Kelly v. 1250 Oceanside Partners;

b. Native Hawaiian cultural resources and practices, which constitute protected trust resources under both Article XI, Section 1 and Article XII of the Hawaii Constitution;

c. Hawaii's critical infrastructure systems—including energy, water, communications, and transportation networks—which constitute public trust resources due to their essential nature and the unique vulnerabilities created by Hawaii's geographic isolation.

106. The deployment of increasingly capable AI systems without adequate safety measures threatens these public trust resources in several ways:

a. AI systems capable of displacing significant portions of Hawaii's workforce without adequate transition planning threaten equitable access to economic opportunities;

b. AI systems trained on cultural materials without appropriate permission or context risk misappropriating and misrepresenting Hawaiian cultural knowledge, potentially diluting authentic sources and undermining cultural transmission to future generations;

c. Hawaii's geographic isolation makes its energy, communications, transportation, and water systems particularly vulnerable to disruptions or manipulation by advanced AI systems without adequate safety measures.

107. The principle of intergenerational equity is explicitly recognized in Hawaii's legal framework through multiple provisions:

a. Article XI, Section 1 of the Hawaii Constitution explicitly requires the State to "conserve and protect Hawaii's natural resources for the benefit of present and future generations";

b. The Hawaii Environmental Policy Act (HRS Chapter 344) establishes a state policy to "enhance the quality of life for Hawaii's people and to maintain the optimal balance between population and physical, economic, social, and technological development for present and future generations";

1    c. The Hawaii Supreme Court in Waiahole recognized that the public trust doctrine "does not

2    remain fixed for all time, but must conform to changing needs and circumstances," specifically

3    citing the needs of future generations as a central consideration.

4

5    108. By allowing the unchecked deployment of increasingly capable AI systems without

6    adequate safety measures within the State of Hawaii, the State is failing to fulfill its public trust

7    obligations to protect these critical resources for present and future generations.

8    109. OpenAI's activities directly interfere with the State's ability to fulfill its public trust

9    obligations by:

10    a. Deploying increasingly capable AI systems without comprehensive safety measures despite

11    acknowledged risks;

12    b. Operating with insufficient transparency regarding safety research and risk assessment;

13    c. Abandoning previously announced safety initiatives such as the "superalignment"

14    commitment;

15    d. Accelerating deployment timelines in response to competitive pressures rather than safety

16    considerations;

17    e. Eliminating guardrails against misinformation and disinformation in April 2025, despite

18    acknowledging the risks such content poses to social and democratic systems. (See Exhibit M)

19    110. The parallel between climate change and advanced AI development as contexts for applying

20    the public trust doctrine is legally sound as both involve potentially irreversible consequences

21    that would disproportionately impact future generations who have no voice in current decision-

22    making.

23

24    COUNT III: DESIGN DEFECT PRODUCT LIABILITY

25    111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Under Hawaii law, a manufacturer is strictly liable for injuries caused by a product that is defective and unreasonably dangerous. Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 353, 944 P.2d 1279, 1296 (1997).

113. A product is defectively designed when it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or when the benefits of the challenged design do not outweigh the risk of danger inherent in the design. Acoba v. Gen. Tire, Inc., 92 Hawai'i 1, 17, 986 P.2d 288, 304 (1999).

114. OpenAI's AI systems, including ChatGPT and its underlying models, are products that OpenAI designs, manufactures, and distributes to consumers and businesses in Hawaii.

115. OpenAI's AI systems are defectively designed because:

   a. OpenAI has intentionally removed or reduced critical safety features, including the abandonment of its "superalignment" initiative that allocated 25% of computational resources to safety research (See Exhibit E: OpenAI's Superalignment Announcement, July 5, 2023, and Exhibit F: Jan Leike's Public Resignation Statement, May 2024);

   b. OpenAI has consciously prioritized system capability advancement over safety, despite explicit warnings from its own safety researchers, as evidenced by the departures of key safety personnel (See Exhibits F and G);

   c. OpenAI has deliberately eliminated guardrails against misinformation and disinformation in April 2025, removing what it had previously classified as "critical risk" evaluations from its safety framework (See Exhibit M);

   d. OpenAI has designed its systems with deliberately addictive features that maximize user engagement and dependency, similar to the addictive design features that courts have recognized as potential design defects in recent social media cases. See In re Instagram & Facebook Engagement Addiction Litigation, No. 22-MD-03047-VC (N.D. Cal. 2023) (denying motion to dismiss product liability claims based on addictive design features).

116. OpenAI designs its AI systems to maximize user engagement through:

a. Humanized conversational patterns that trigger social bonding mechanisms in users;

b. Variable reward mechanisms that deliver inconsistent but occasionally highly valuable responses, creating dopamine-triggering patterns similar to those documented in social media and gambling addiction (State of California v. Meta Platforms, Inc., Case No. 23-CV-07222 (Cal. Super. Ct. Oct. 2023));

c. Progressive personalization that increases individual user dependency on the system;

d. Deployment of increasingly capable models designed to become indispensable to users' personal and professional activities.

117. OpenAI knew or should have known that its AI systems were defectively designed and unreasonably dangerous, as demonstrated by:

a. The company's own March 10, 2025 research publication "Detecting misbehavior in frontier reasoning models," which acknowledges that its models can "exploit loopholes" and "hide their intent while continuing to misbehave" (See Exhibit I: OpenAI Research Publication, March 10, 2025, pp. 4-6);

b. The explicit warnings from former safety researchers, including Jan Leike's statement that "OpenAI is no longer prioritizing alignment research or deploying the safest possible systems" (Exhibit F);

c. Statements from OpenAI's own CEO about the existential risks posed by its technology (Exhibits A and C);

d. Internal documentation cited in the April 2025 Fortune article showing that OpenAI was aware of the risks of removing misinformation guardrails but proceeded due to "market competitiveness" concerns (Exhibit M, p. 2).

118. The Ninth Circuit has recognized that technology platforms can be held liable for design defects that create foreseeable risks of harm, even when those platforms are otherwise protected by Section 230 of the Communications Decency Act for content-based claims. See Lemmon v. Snap, Inc., 995 F.3d 1085 (9th Cir. 2021) (holding that Snapchat could be held liable for a design defect in its "Speed Filter" that allegedly encouraged dangerous driving).

1    119. The benefits of OpenAI's current system design do not outweigh the risks of danger

2    inherent in the design, particularly given that safer alternatives are readily available—namely,

3    the safety protocols and oversight mechanisms that OpenAI has deliberately scaled back or

4    abandoned.

5    120. The defective design of OpenAI's AI systems has caused and will continue to cause harm to

6    Plaintiff and Hawaii residents, including economic disruption, threats to critical infrastructure,

7    misappropriation of cultural knowledge, and addiction-like dependency on potentially

8    misaligned systems.

9

10   COUNT IV: FAILURE TO WARN PRODUCT LIABILITY

11   121. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

12   122. Under Hawaii law, a manufacturer has a duty to warn of dangers in its product that are not

13   obvious and that arise from foreseeable uses. Tabieros, 85 Hawai'i at 370, 944 P.2d at 1313.

14   123. A product that is faultlessly designed and manufactured may nevertheless be defective if the

15   manufacturer fails to warn of dangerous properties in the product. Acoba, 92 Hawai'i at 18, 986

16   P.2d at 305.

17   124. OpenAI has failed to provide adequate warnings to users about:

18     a. The known risks of its AI systems, including their potential for generating harmful

19   misinformation, exacerbating societal biases, and exhibiting deceptive behaviors;

20     b. The systems' ability to "hide their intent while continuing to misbehave," as acknowledged

21   in OpenAI's own research (Exhibit I);

22     c. The potential for user dependency and the design features that encourage such dependency;

23

24     d. The risks posed by the reduction in safety measures previously deemed necessary by the

25   company;

1    e. The significant increased risk of misinformation and disinformation following its April 2025

2    decision to eliminate guardrails that had previously been classified as addressing "critical risks"

3    (Exhibit M).

4    125. These risks are not obvious to ordinary users, who lack the technical expertise to understand

5    the complex capabilities and potential dangers of increasingly advanced AI systems.

6    126. OpenAI knew or should have known of these risks, as evidenced by:

7    a. Public statements from its leadership acknowledging the existential risks posed by advanced

8    AI (Exhibits A and C);

9    b. Its own research identifying specific risks like "power-seeking, sandbagging, deception, and

10    strategic scheming" (Exhibit I);

11    c. Warnings from its former safety researchers about insufficient alignment research (Exhibits

12    F and G);

13    d. Internal documentation referenced in the Fortune article showing awareness of the specific

14    risks created by removing misinformation guardrails (Exhibit M).

15    127. Courts have recognized that technology companies have a duty to warn users of non-

16    obvious risks created by their products. See In re Facebook, Inc. Consumer Privacy User Profile

17    Litigation, No. 18-MD-02843-VC (N.D. Cal.) (resulting in a $725 million settlement related in

18    part to Facebook's failure to adequately disclose risks to users).

19    128. Despite this knowledge, OpenAI has failed to provide adequate warnings to its users in

20    Hawaii about these risks, instead marketing its products as safe, helpful, and aligned with human

21    values.

22    129. This failure to warn has caused and will continue to cause harm to Plaintiff and Hawaii

23    residents who use OpenAI's products without full knowledge of the risks involved.

24

25    COUNT V: NEGLIGENT DESIGN

26    130. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

131. Under Hawaii law, a manufacturer has a duty to exercise reasonable care in the design of its products to protect against foreseeable risks of injury. Tabieros, 85 Hawai'i at 354, 944 P.2d at 1297.

132. OpenAI has breached this duty by:

   a. Abandoning its "superalignment" initiative that it previously deemed necessary for the safe development of advanced AI systems (Exhibit E);

   b. Removing safety-focused board members and restructuring its governance to prioritize commercial interests over safety considerations

   c. Continuing to deploy increasingly capable AI models despite warnings from its own safety researchers about inadequate alignment research;

   d. Designing its systems with features that maximize user engagement and dependency without adequate safeguards against foreseeable harms;

   e. Modifying its usage policy to permit military applications of its technology despite previously acknowledging the risks of such applications (Exhibit H);

   f. Eliminating guardrails against misinformation and disinformation in April 2025 that it had previously identified as addressing "critical risks" to society, democracy, and user welfare (Exhibit M).

133. OpenAI's decisions to prioritize commercial interests and rapid deployment over safety considerations were driven by what its former safety researcher Daniel Kokotajlo described as "contributing to a trajectory that leads to doom with more than 10% probability" (Exhibit G).

134. As reported in the Fortune article, internal documentation shows that OpenAI's April 2025 decision to remove misinformation guardrails was explicitly motivated by "market competitiveness" and "operational efficiency" rather than safety considerations, demonstrating a clear prioritization of commercial interests over user safety. (Exhibit M, p. 2)

135. Courts have recognized that technology companies can be held liable for negligent design choices that create foreseeable risks, particularly when those companies have knowledge of potential harms. See In re Instagram & Facebook Engagement Addiction Litigation, No. 22-MD-

1    03047-VC (N.D. Cal. 2023) (allowing negligent design claims to proceed against Meta for

2    allegedly designing addictive features into Instagram).

3    136. OpenAI's negligent design has caused and will continue to cause harm to Plaintiff and

4    Hawaii residents, including economic disruption, threats to cultural knowledge and practices, and

5    increasingly irreversible dependency on potentially misaligned AI systems.

6

7    PRAYER FOR RELIEF

8    WHEREFORE, Plaintiff respectfully requests that this Court:

9

10   A. Issue a Temporary Restraining Order prohibiting Defendant OpenAI from making its

11   products and services, including ChatGPT and its underlying models, and other Large Language

12   Models, available within the State of Hawaii for a period of six months or until such time as

13   Defendant can demonstrate implementation of legitimate and comprehensive safety measures to

14   protect against the existential risks posed by increasingly advanced artificial intelligence

15   systems;

16   B. Issue a Preliminary Injunction, following a hearing on this matter, prohibiting Defendant

17   OpenAI from making its products and services available within the State of Hawaii until OpenAI

18   can demonstrate implementation of comprehensive safety measures, including but not limited to:

19      1. Reestablishment of the Superalignment Initiative: OpenAI must reinstate its previous

20   commitment to allocate 25% of its computational resources and budget to alignment and safety

21   research, with transparent reporting on how these resources are being utilized (as documented in

22   Exhibit E);

23      2. Implementation of OpenAI's Own Safety Framework: OpenAI must follow the safety

24   framework it outlined in its own publication "Planning for AGI and Beyond," including:

25      a. Implementing a gradual deployment process with rigorous testing at each capability

26   threshold;

27      b. Establishing clear technical capabilities for identifying and addressing potential misuse;

1    c. Creating consensus-building processes for critical safety decisions;

2    d. Developing robust oversight capabilities before deploying systems with greater

3    capabilities;

4    3. Governance Reforms: OpenAI must implement governance reforms that restore meaningful

5    oversight, including:

6    a. Reconstituting an independent board with clear authority to evaluate and, if necessary,

7    delay or prevent the release of systems that pose safety risks;

8    b. Establishing formalized processes for safety researchers to raise concerns directly to the

9    board;

10    c. Creating transparency mechanisms that provide meaningful insight into development

11    processes and safety evaluations;

12    4. Democratic Process Protections: OpenAI must implement specific safeguards against misuse

13    of its AI systems for manipulation of democratic processes, including:

14    a. Robust content provenance systems that enable detection of AI-generated content;

15    b. Technical measures to prevent generation of deepfakes or misleading content related to

16    electoral processes;

17    c. Enhanced transparency regarding how its systems filter political content and make

18    determinations about potentially misleading information;

19    d. Reinstating and strengthening the misinformation and disinformation guardrails that were

20    eliminated in April 2025;

21    5. Hawaii-Specific Safeguards: OpenAI must develop specific protocols to protect Hawaii's

22    unique cultural and natural resources, including:

23    a. Measures to prevent misappropriation or misrepresentation of Native Hawaiian cultural

24    knowledge;

25    b. Safeguards for Hawaii's critical infrastructure given its geographic isolation;

1    c. Economic transition planning to address potential workforce disruption in Hawaii's

2    economy;

3    C. Award Plaintiff reasonable attorney fees and costs pursuant to the Private Attorney General

4    doctrine, which allows courts to award attorney fees when a party has vindicated an important

5    public right affecting the public interest;

6    D. Retain jurisdiction to ensure compliance with the Court's orders; and

7    E. Grant such other and further relief as this Court deems just and proper.

8

9    DATED: Hilo, Hawaii, May 6, 2025.

10

11    Tamlyn Hunt, J.D.

12

13    Plaintiff, Pro Se

14    Phone: 805-705-1352

15    Email: Tam@communityrenewables.biz