1    IN THE UNITED STATES DISTRICT COURT

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
July 15, 2025, 7:06 pm (ea)
Lucy H.Carrillo, Clerk of Court

2    FOR THE DISTRICT OF HAWAII

3    **TAMLYN HUNT, J.D.,**

4    Plaintiff, Pro Se,

5    v.

6    **OPENAI, INC., a Delaware Corporation,**

7    Defendant.

8    **CASE NO. 1:25-cv-00191-JAO-KJM**

9

10

11    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST**

12    **AMENDED COMPLAINT**

13

14    **July 15, 2025**

15

1

1

# **TABLE OF CONTENTS**

2  I. INTRODUCTION..........................................................................................7

3  II. HAWAII COURTS HAVE ALREADY ESTABLISHED THE LEGAL FRAMEWORK FOR
4  THIS CASE...................................................................9

5  III. PLAINTIFF HAS CLEAR ARTICLE III STANDING.....................................11

6  IV. THE POLITICAL QUESTION DOCTRINE CANNOT APPLY WHEN POLITICAL
7  BRANCHES HAVE FAILED TO ADDRESS ACKNOWLEDGED EXISTENTIAL
8  RISKS............................................................................15

9  V. PLAINTIFF STATES VALID CLAIMS UNDER HAWAII LAW......................22

10  VI. THE *CHATMAN* PRECEDENT STRONGLY SUPPORTS PLAINTIFF…….26

11  VII. DISMISSAL WITH PREJUDICE IS INAPPROPRIATE..............................27

12  VIII. CONCLUSION..........................................................................................28

13

# TABLE OF AUTHORITIES

## CASES

### Federal Cases:

Baker v. Carr, 369 U.S. 186 (1962) ................................................... 17, 18, 22

Birdsong v. Apple, Inc., 590 F.3d 955 (9th Cir. 2009) ................. 14

Cahen v. Toyota Motor Corp., 717 F. App'x 720 (9th Cir. 2017) ..... 14

Chatman v. Otani, Civil No. 21-00268 JAO-KJM (D. Haw. July 13, 2021) .............................................. 7, 8, 9, 11, 26, 27

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013) ..................... 13

Cousart v. OpenAI LP, 2024 WL 3282522 (N.D. Cal. May 24, 2024) .... 20, 21

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc., 528 U.S. 167 (2000) ............................................... 12

Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221 (1986) ....................................................... 16

Lemmon v. Snap, Inc., 995 F.3d 1085 (9th Cir. 2021) ................ 20, 25

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ............... 12

Massachusetts v. EPA, 549 U.S. 497 (2007) ....................... 15, 19

Sierra Club v. Morton, 405 U.S. 727 (1972) ...................................... 12

Spokeo, Inc. v. Robins, 578 U.S. 330 (2016) ..................................... 13

TransUnion LLC v. Ramirez, 594 U.S. 413 (2021) ........................... 13, 14

### Hawaii Cases:

Acoba v. Gen. Tire, Inc., 92 Hawai'i 1, 986 P.2d 288 (1999) ...... 17, 25

Akau v. Olohana Corp., 65 Haw. 383, 652 P.2d 1130 (1982) ...... 12, 13

County of Hawaii v. Ala Loop Homeowners, 123 Hawai'i 391, 235 P.3d 1103 (2010) ................................... 10, 23

In re Haw. Elec. Light Co., 152 Hawai'i 352, 526 P.3d 329 (2023)
("HELCO") ....................................................... 10

In re Maui Elec. Light Co., 150 Hawai'i 528, 506 P.3d 192 (2022)
("MECO") ................................................... 10

In re Water Use Permit Applications, 94 Haw. 97, 9 P.3d 409 (2000)
("Waiahole") ............................. 10, 11, 15, 19, 23

Kelly v. 1250 Oceanside Partners, 111 Hawai'i 205, 140 P.3d 985 (2006) ....................... 10, 11,
17, 23, 24

Life of the Land v. Ariyoshi, 59 Haw. 156, 577 P.2d 1116
(1978) ............................................................ 22

Life of the Land v. Land Use Commission, 63 Haw. 166, 623 P.2d 431
(1981) ................................................ 10

Littleton v. State, 66 Haw. 55, 656 P.2d 1336 (1982) ................ 22

Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462 (2020) .............. 11, 24

Mauna Kea Anaina Hou v. Board of Land & Natural Resources, 136 Hawai'i 376, 363 P.3d 224
(2015) ................................................. 10

Navahine F., et al. v. Department of Transportation, State of Hawai'i, et al. (Civil No. 1CCV-22-
0000631) (2024) ("Nāwahine Settlement") ............................. 9, 10, 11, 12, 23, 24, 28

Sierra Club v. Department of Transportation, 115 Hawai'i 299, 167 P.3d 292 (2007) ..................
10, 13

Sierra Club v. Hawaii Tourism Authority, 100 Hawai'i 242, 59 P.3d 877
(2002) .............................................. 12

Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 944 P.2d 1279
(1997) ............................................................ 17, 25

**Other Jurisdictions:**

Neubauer, et al. v. Germany, BVerfG, Order of the First Senate of 24 March
2021 .................................................................. 16

Sharma v. Minister for the Environment, [2021] FCA 560 (Federal Court of
Australia) ................................................................. 16

4

State of California v. Meta Platforms, Inc., Case No. 23-CV-07222 (Cal. Super. Ct. Oct. 2023) ............................................................. 20

Urgenda Foundation v. State of the Netherlands, ECLI:NL:HR:2019:2007 ................................................................ 16

**CONSTITUTIONAL PROVISIONS**

Haw. Const. art. XI, § 1 ...................................................... 10, 14, 18, 24

Haw. Const. art. XI, § 9 ...................................................... 10

Haw. Const. art. XII .................................................. 31, 33

**STATUTES**

HRS § 7-1 .................................................................. 18

HRS § 46-15.6 .................................................................. 29

HRS § 225P-5 .................................................................. 10

HRS § 225P-7 .................................................................. 10

HRS § 225P-8 .................................................................. 10

HRS Chapter 344 (Hawaii Environmental Policy Act) ................. 32

**RULES**

Hawaii Rules of Civil Procedure, Rule 65 ............................................... 1

**OTHER AUTHORITIES**

Goldman Sachs, "The Potentially Large Effects of Artificial Intelligence on Economic Growth" (March 2023) ............................... 13, 25

McKinsey Global Institute, "The Age of AI: Work, Progress, and Prosperity" (2025) ...................................................... 15

Forbes, "These Jobs Will Fall First As AI Takes Over The Workplace" (April 25, 2025) ....................................................... 13

Dario Amodei, "The White-Collar Bloodbath: AI's Impact on Professional Employment," Public Statement (May 2025) ........ 13, 25

1    Tristan Harris April 2025 TED talk ......................................................... 16

2

3

1    **I. INTRODUCTION**

2    Hawaii courts have already established the exact legal framework needed to address OpenAI's

3    conduct. Through the landmark 2024 Nāwahine Settlement and decades of expansive public trust

4    doctrine jurisprudence, Hawaii has positioned itself as the nation's leader in applying

5    constitutional principles to prevent irreversible technological harm. This case represents the

6    straightforward application of proven Hawaii precedents to corporate accountability.

7    Defendant OpenAI's motion to dismiss fundamentally mischaracterizes both the law and the

8    facts of this case. This Court's own precedents, particularly the landmark decision in *Chatman v.*

9    *Otani*, Civil No. 21-00268 JAO-KJM (D. Haw. July 13, 2021), provide a clear roadmap for

10    holding institutions accountable when they abandon their own established safety protocols. Just

11    as the Hawaii Department of Public Safety showed "complete disregard for the Response Plan"

12    in *Chatman*, OpenAI has systematically dismantled the safety commitments it once deemed

13    essential for responsible AI development -- and this is essentially acknowledged in defendant's

14    Motion to Dismiss, by omission and admission.

15    The parallels are striking. In *Chatman*, this Court found "There is almost no clearer an example

16    of complete disregard for the Response Plan and abandonment of precautionary measures to

17    prevent the spread of COVID-19 between DPS facilities." Here, OpenAI similarly abandoned its

18    "superalignment" initiative that pledged 25% of computational resources to safety research,

19    eliminated safety-focused board members, and most recently removed guardrails against

20    misinformation that it had previously classified as addressing "critical risks." First Amended

21    Complaint ("FAC") ¶¶34, 38, 47-48.

22    Tellingly, Defendant's motion completely fails to address Plaintiff's detailed allegations about

23    OpenAI's abandonment of its "superalignment" initiative---the company's own pledge to allocate

24    25% of computational resources to safety research. FAC ¶34. This conspicuous silence suggests

25    OpenAI cannot credibly dispute these damaging facts about its systematic dismantling of safety

26    commitments it once deemed essential for responsible AI development. When a defendant fails

27    to challenge specific factual allegations in a motion to dismiss, courts may reasonably infer the

28    accuracy of those allegations.

1    Defendant's arguments fail on multiple levels. Their standing arguments ignore Hawaii's

2    expansive precedents recognizing specialized knowledge and legislative involvement as creating

3    particularized injury. See Motion for Temporary Restraining Order ("TRO Motion"),

4    Memorandum in Support, pp. 4-8. Their political question argument would immunize all

5    corporate conduct from judicial review---a position this Court rejected when examining

6    institutional safety failures in *Chatman*. And their failure-to-state-claims arguments ignore

7    Hawaii's broad public trust doctrine and the concrete economic harms already materializing

8    across Hawaii's workforce.

9    Most fundamentally, Defendant seeks to avoid judicial scrutiny precisely when their own

10    research confirms the dangers Plaintiff identified. FAC ¶¶45-46. OpenAI's March 2025

11    publication acknowledges their systems can "exploit loopholes" and "hide their intent while

12    continuing to misbehave," yet they eliminated safety guardrails in April 2025 for "market

13    competitiveness" reasons. FAC ¶¶47-48. This conduct---prioritizing commercial interests over

14    safety measures the company itself deemed necessary---mirrors exactly the institutional

15    accountability failures this Court addressed in *Chatman*.

16    As the First Amended Complaint makes clear: this lawsuit is Plaintiff's last line of defense after

17    failing in his efforts at working with legislators to pass state law to regulate AI; after Congress

18    has utterly failed to do so; and after President Trump tore up the already extremely weak efforts

19    by the previous administration to create a regulatory framework by executive order. He and his

20    Vice President have explicitly declared their intention to impose no restraints whatsoever on a

21    technology that defendant itself, through its various representatives including its CEO, has

22    described as a possible existential threat to humanity. The courts are the last line of defense at

23    this juncture. We pray that the court takes up this mantle of responsibility and acts with wisdom.

24    Hawaii law provides clear legal standards for evaluating the questioned conduct in this case. The

25    Hawaii Supreme Court's expansive public trust doctrine, robust public nuisance framework, and

26    comprehensive product liability law offer "judicially discoverable and manageable standards" for

27    assessing OpenAI's abandonment of safety commitments. TRO Motion, Memorandum in

28    Support, pp. 24-39. This Court's demonstrated expertise in complex institutional accountability

1    cases, as shown in *Chatman*, ensures fair adjudication of these novel but legally cognizable

2    claims.

3    Last, OpenAI's motion to dismiss reveals a breathtaking contradiction in the company's own

4    position on AI risks. In May 2023, OpenAI CEO Sam Altman personally signed the Center for

5    AI Safety's "Statement on AI Risk," which declared that "Mitigating the risk of extinction from

6    AI should be a global priority alongside other societal-scale risks such as pandemics and nuclear

7    war." FAC Exhibit D. Altman put his name alongside leading scientists and public figures in

8    acknowledging that AI poses extinction-level risks comparable to humanity's gravest threats. Yet

9    here, barely two years later, OpenAI argues this Court should dismiss a lawsuit seeking to create

10    the very safety measures that would address those acknowledged risks here in Hawaii.

11    If Altman truly believes AI needs to be taken extremely seriously as a possible cause of human

12    extinction on par with nuclear war, how can OpenAI simultaneously argue that judicial

13    intervention to require safety measures presents no justiciable case? This contradiction exposes

14    the fundamental dishonesty in OpenAI's position: the company publicly acknowledges

15    catastrophic risks to generate regulatory goodwill and public trust, while privately fighting any

16    actual accountability measures that might constrain its commercial ambitions.

17    OpenAI cannot have it both ways---either AI poses existential risks warranting serious

18    intervention and regulation, or it does not. Having signed a public statement acknowledging the

19    former, OpenAI lacks standing to argue the latter.

20    **II. HAWAII COURTS HAVE ALREADY ESTABLISHED THE LEGAL FRAMEWORK**

21    **FOR THIS CASE**

22    **A. The 2024 Nāwahine Settlement Provides Direct Precedent**

23    Hawaii courts have already solved the exact legal questions Defendant claims are unanswerable.

24    The Nāwahine Settlement (*Navahine F., et al. v. Department of Transportation, State of Hawai'i,*

25    *et al.*, Civil No. 1CCV-22-0000631), approved by the Honorable John M. Tonaki in June 2024,

26    established multiple precedents that directly apply here.

1    The settlement explicitly recognized that Hawaii's public trust doctrine requires judicial

2    intervention **before irreversible harm occurs when facing emerging threats with potentially**

3    **catastrophic consequences**. FAC ¶¶101-104. This is precisely the situation with defendant's

4    AGI development, where industry leaders---including OpenAI's own CEO---have compared the

5    risks from AI to "pandemics and nuclear war." FAC ¶32. The settlement confirmed that Hawaii's

6    constitutional public trust obligations extend to protecting all resources essential for present and

7    future generations, including economic systems, infrastructure, and social stability---exactly

8    what OpenAI's conduct threatens. FAC ¶¶105-109.

9    Most importantly, the settlement established that when scientific consensus indicates substantial

10   risk of irreversible harm, courts have not just the authority but a societal obligation to require

11   precautionary measures before damage becomes manifested. This applies directly to AI systems

12   where OpenAI's own research confirms systems can "hide their intent while continuing to

13   misbehave." FAC ¶46.

14   **B. Hawaii's Uniquely Expansive Public Trust Doctrine Creates Clear Legal Standards**

15   Unlike other jurisdictions where Defendant might argue political question or standing barriers,

16   Hawaii's constitutional framework provides clear legal standards for addressing exactly this type

17   of institutional conduct. The Hawaii Supreme Court's progressive jurisprudence includes the

18   *Waiahole* decision from 2000, which established that the public trust doctrine "must conform to

19   changing needs and circumstances" and applies to novel threats to public resources. In *Kelly*

20   (2006), the Court determined that the doctrine "encompasses all public resources" and "imposes

21   affirmative obligations" on relevant actors. Recent climate cases have established that courts

22   must evaluate whether institutions are taking "reasonable available measures to abate risks"

23   when facing potentially catastrophic harm.

24   Hawaii's constitutional mandate under Article XI, Section 1 requires protection of resources "for

25   the benefit of present and future generations"---language that directly supports judicial

26   intervention against threats to intergenerational welfare. The Nāwahine Settlement confirmed

27   this constitutional language creates enforceable legal duties, not mere aspirational goals.

28   **C. This Court's Institutional Accountability Expertise**

1   Judge Otake's comprehensive 69-page decision in *Chatman v. Otani* provides direct precedent

2   for examining institutional safety protocol abandonment. The Court's finding of "complete

3   disregard for the Response Plan" and "abandonment of precautionary measures" applies

4   identically to OpenAI's documented safety commitment elimination. Both cases involve

5   institutions abandoning their own established safety commitments, both require examining

6   whether institutions have "taken reasonable available measures to abate risks," both involve

7   connecting individual decisions to broader institutional policy failures, and both seek court

8   orders requiring compliance with safety protocols the institution itself previously deemed

9   necessary.

10  **III. PLAINTIFF HAS CLEAR ARTICLE III STANDING**

11  **A. Hawaii's Public Trust Doctrine Creates Strongest Standing Foundation**

12  Unlike federal constitutional claims that might face political question challenges, Hawaii's public

13  trust doctrine provides the clearest and strongest path to standing. The Hawaii Supreme Court

14  confirmed in *Waiahole* that "any member of the public has standing to raise the issue of whether

15  the government had complied with its duty to protect the public trust." *In re Water Use Permit*

16  *Applications*, 94 Haw. 97, 9 P.3d 409 (2000).

17  More importantly, private conduct that interferes with public trust resources creates direct

18  standing for Hawaii residents. In *Kelly v. 1250 Oceanside Partners*, the Court established that

19  private activities affecting public resources can trigger public trust analysis, and in *Maui v.*

20  *Hawaii Wildlife Fund*, the Supreme Court confirmed this principle applies when private conduct

21  has substantial public impacts.

22  OpenAI's systems function as essential public infrastructure integrated into Hawaii's educational

23  institutions (over 80% integration as alleged, FAC ¶50), government services and operations

24  throughout the state, critical economic infrastructure and professional services, and public

25  information and communication systems. The 2024 Nāwahine Settlement established that threats

26  to intergenerational welfare from technological development fall squarely within public trust

27  doctrine. FAC ¶¶101-104. AI systems that pose risks to "present and future generations" (the

28  constitutional language from Article XI, Section 1) clearly qualify for this protection.

1    By systematically abandoning safety measures (FAC ¶¶34-48), OpenAI directly interferes with

2    the State's ability to fulfill its public trust obligations to protect Hawaii's resources from

3    technological threats. This creates the concrete injury necessary for standing under Hawaii's

4    expansive public trust framework. The Nāwahine Settlement confirmed that Hawaii courts must

5    act to protect public trust resources from novel technological threats before irreversible harm

6    occurs. OpenAI's conduct---abandoning its superalignment initiative (FAC ¶34), eliminating

7    safety-focused oversight (FAC ¶¶35-42), and removing misinformation guardrails (FAC ¶¶47-

8    48)---creates exactly the type of threat to intergenerational welfare that triggers public trust

9    standing.

10   **B. Plaintiff Suffers Special Injury Distinguished from General Public**

11   Defendant's standing argument ignores Hawaii's well-established precedents recognizing that

12   specialized knowledge and sustained advocacy create the "special injury" necessary for public

13   interest litigation. The Hawaii Supreme Court has consistently held that individuals with

14   technical expertise and sustained involvement in public issues suffer particularized injury

15   sufficient for standing. FAC ¶¶16-21.

16   In *Akau v. Olohana Corp.*, the Hawaii Supreme Court established that "a private individual may

17   maintain an action to abate or enjoin a public nuisance if the individual suffers a 'special injury'

18   different from that suffered by the public." 65 Haw. 383, 386, 652 P.2d 1130, 1133 (1982).

19   Plaintiff's specialized knowledge of AI safety acquired through professional work in public

20   policy provides precisely such unique insight into risks that differ substantially from general

21   public understanding. FAC ¶¶11-12, 17-18.

22   The Hawaii Supreme Court reinforced this principle in *Sierra Club v. Hawaii Tourism Authority*,

23   recognizing that individuals with specialized knowledge may demonstrate special injury when

24   they can "demonstrate some injury to a recognized interest such as economic or aesthetic, and is

25   not merely asserting a general interest in the subject matter of the litigation." 100 Hawai'i 242, 59

26   P.3d 877 (2002). Plaintiff's professional expertise in AI policy, combined with concrete

27   legislative involvement, creates exactly this type of recognized interest. FAC ¶¶12, 19.

Plaintiff's standing is further strengthened by sustained legislative advocacy, which courts recognize creates concrete procedural injury. *Sierra Club v. Department of Transportation* acknowledged that "a plaintiff who has been involved in the process... may have standing because of the expertise developed from that involvement." 115 Hawai'i 299, 167 P.3d 292 (2007). Plaintiff's collaboration with Senators Gabbard and Lee to draft and introduce AI safety legislation, publication of policy analysis in major publications, and continued advocacy efforts establish the type of sustained involvement courts recognize as creating particularized injury. FAC ¶¶12, 77-78; TRO Motion, Memorandum in Support, pp. 5-7. This is not "longstanding concern" but active legislative participation that has been frustrated by the very conduct Plaintiff challenges.

**C. Concrete and Imminent Economic Injuries Are Documented**

Defendant's characterization of Plaintiff's injuries as "speculative" ignores authoritative economic data showing immediate, quantifiable job displacement already underway. Unlike hypothetical future harm, the economic disruption is documented through industry analysis with timelines measured in months and years, not decades.

**Most significantly, Dario Amodei, CEO of Anthropic (OpenAI's primary competitor), warned in May 2025 that "AI could wipe out half of all entry-level white-collar jobs -- and spike unemployment to 10-20% in the next one to five years."** See Exhibit 2. Amodei characterized this as a "white-collar bloodbath" occurring "in a small amount of time -- as little as a couple of years or less." This timeline transforms speculative concerns into imminent, concrete harm.

**Goldman Sachs economists confirm this immediacy**, predicting generative AI could affect 300 million jobs globally, with two-thirds of U.S. jobs "exposed to some degree of AI automation." Professional services face particularly severe disruption: administrative jobs 46% automation risk, legal professions 44%, business and financial operations 35%. See Exhibit 1. As an island economy heavily dependent on professional services, Hawaii faces disproportionate vulnerability.

1   **The displacement is already occurring.** January 2025 data shows the lowest professional

2   services job openings since 2013—a 20% year-over-year drop. See Exhibit 4. Approximately

3   40% of white-collar job seekers in 2024 failed to secure interviews. See Exhibit 5. Major firms

4   have openly acknowledged AI-driven hiring freezes, with IBM's CEO estimating 7,800 jobs at

5   risk in HR alone. See Exhibit 7.

6   **Hawaii's unique vulnerabilities compound these harms.** Geographic isolation limits

7   workforce mobility during technological transitions, while the concentrated service economy

8   lacks economic diversification for alternative employment. When displacement occurs, Hawaii

9   workers cannot easily relocate compared to mainland workers.

10  **OpenAI's own research confirms imminent technological risks.** The company's March 2025

11  publication acknowledges systems can "exploit loopholes" and "hide their intent while

12  continuing to misbehave," concluding with warnings to "tread with extreme caution." FAC ¶46.

13  Combined with OpenAI's April 2025 elimination of safety guardrails for "market

14  competitiveness" (FAC ¶48), this creates concrete, immediate harm sufficient for standing.

15  Unlike speculative hacking scenarios in *Cahen v. Toyota* or theoretical hearing loss in *Birdsong*

16  *v. Apple*, these economic impacts have definite timelines from industry leaders positioned to

17  understand AI capabilities. The Supreme Court's emphasis on concrete injury in *TransUnion*

18  *LLC v. Ramirez* supports rather than undermines Plaintiff's position, as specialized knowledge

19  allows identification of concrete harms invisible to general plaintiffs.

20  **D. Causation and Redressability Are Clearly Established**

21  Defendant's causation and redressability arguments fundamentally misunderstand both the scope

22  of OpenAI's market dominance and the nature of judicial relief. These arguments, if accepted,

23  would render virtually any societal problem unaddressable through litigation.

24  Defendant's argument ignores OpenAI's overwhelming market position. ChatGPT is by far the

25  most widely used large language model globally, with over 100 million weekly active users as of

26  2024---more than the next five AI platforms combined. OpenAI's ChatGPT holds approximately

27  60% of the consumer AI market share, making it the clear industry leader whose practices

14

1   directly influence the majority of AI interactions. This market dominance means OpenAI's safety

2   practices directly affect the vast majority of AI-dependent economic activity. When the dominant

3   market player abandons safety protocols, this creates direct causation for the economic and social

4   harms alleged.

5   Defendant's argument that relief cannot be granted because other AI companies exist would, if

6   accepted, make virtually any societal issue unaddressable through litigation. Under this logic, no

7   tobacco company could be held liable because other tobacco companies exist, no pharmaceutical

8   company could be held liable for defective drugs because other companies make drugs, and no

9   financial institution could be held liable for predatory lending because other lenders exist. This

10  argument proves too much and would effectively immunize any defendant in any industry from

11  judicial accountability.

12  The Supreme Court's decision in *Massachusetts v. EPA* confirms that relief against major

13  contributors to a problem satisfies redressability even when other actors remain. 549 U.S. 497,

14  525-26 (2007). Judicial relief requiring OpenAI to restore safety measures would substantially

15  reduce risks to Hawaii residents through multiple mechanisms. First, requiring OpenAI to restore

16  its abandoned safety commitments would directly protect the majority of Hawaii's AI users who

17  rely on OpenAI's systems. Second, as the industry leader, OpenAI's safety practices create

18  industry standards---requiring OpenAI to implement robust safety measures would likely

19  encourage industry-wide improvements. Third, successful litigation against OpenAI would

20  establish legal precedent that would facilitate similar actions against other AI companies.

21  **IV. THE POLITICAL QUESTION DOCTRINE CANNOT APPLY WHEN POLITICAL**

22  **BRANCHES HAVE FAILED TO ADDRESS ACKNOWLEDGED EXISTENTIAL RISKS**

23  **A. Political Branch Failure Necessitates Judicial Review**

24  OpenAI argues that AI regulation should be "committed for resolution to the halls of Congress or

25  the confines of the Executive Branch," but this argument fails because those very institutions

26  have abdicated responsibility for addressing the catastrophic risks OpenAI itself acknowledges.

As alleged in the FAC, the political solutions OpenAI's CEO requested have systematically failed:

- Congress has failed to enact meaningful AI legislation despite multiple hearings where Altman testified about catastrophic risks
- President Trump "explicitly revoked Biden's AI safeguards in favor of a minimal regulatory approach"
- International frameworks have collapsed with U.S. withdrawal from AI safety agreements
- State legislative efforts have stalled despite Plaintiff's sustained advocacy

When a company acknowledges extinction-level risks comparable to "pandemics and nuclear war," and the political branches those risks demand action from fail to act, judicial review becomes constitutionally necessary, not prohibited. The political question doctrine does not create immunity for corporate conduct threatening public welfare when democratic processes fail.

**B. Manageable Legal Standards Exist Regardless of OpenAI's Preferences**

The political question doctrine turns on whether courts have manageable standards for review, not whether defendants prefer political solutions. Here, multiple clear legal frameworks provide precisely the standards courts need:

**1. OpenAI's Own Abandoned Safety Standards**

Most importantly, OpenAI itself defined adequate safety measures through its "superalignment" initiative (25% computational resources to safety research) and comprehensive safety frameworks. Courts need not make policy judgments about optimal AI development---they need only determine whether OpenAI follows safety standards it once deemed necessary.

**2. Hawaii's Established Legal Doctrines**

- **Public Trust Doctrine**: Provides specific tests for protecting resources for future generations

1   • **Product Liability Law**: Offers clear standards for design defects and failure to warn

2   • **Public Nuisance Framework**: Addresses unreasonable interference with public welfare

3   **3. Traditional Corporate Accountability Principles**

4   Courts regularly evaluate whether companies follow their own stated safety commitments,

5   disclose known risks, and design products without unreasonable dangers.

6   **C. OpenAI Fails Every Baker v. Carr Factor**

7   Under *Baker v. Carr*'s six-factor test, 369 U.S. 186, 217 (1962), not a single element supports

8   finding a political question here:

9   **1. No Textual Constitutional Commitment to Other Branches**

10  Corporate safety regulation represents core judicial function that courts have performed for

11  centuries. OpenAI identifies no constitutional text committing AI safety oversight exclusively to

12  political branches. To the contrary, the Constitution's Due Process clauses and Hawaii's

13  Constitution explicitly require judicial protection of individual rights against corporate harm.

14  **2. Judicially Discoverable and Manageable Standards Exist**

15  Contrary to OpenAI's argument about lacking "manageable standards," multiple clear legal

16  frameworks provide precisely the standards courts need:

17  • Hawaii's Public Trust Doctrine: *Kelly v. 1250 Oceanside Partners* established that the

18      doctrine "encompasses all public resources" and "imposes affirmative obligations,"

19      providing specific legal tests courts regularly apply. 111 Hawai'i 205, 140 P.3d 985

20      (2006).

21  • Product Liability Law: Hawaii's well-established framework under *Tabieros* and *Acoba*

22      provides clear standards for evaluating design defects, failure to warn, and negligent

23      design.

- OpenAI's Own Safety Standards: Most importantly, OpenAI itself has defined adequate safety measures through its abandoned "superalignment" initiative and former safety frameworks.

**3. No Initial Policy Determination Required**

OpenAI argues courts cannot decide "without an initial policy determination of a kind clearly for nonjudicial discretion," but this mischaracterizes Plaintiff's claims. Plaintiff does not ask courts to determine AI policy generally, but to enforce specific legal duties: whether OpenAI breached its own safety commitments, whether its products contain design defects under established product liability law, and whether its conduct violates Hawaii's public trust doctrine. These represent traditional judicial functions applying existing legal standards to corporate conduct.

**4. No Disrespect to Coordinate Branches**

Judicial review of corporate compliance with legal duties shows proper respect for coordinate branches by enforcing laws they have enacted. Hawaii's Legislature established the public trust doctrine (Article XI, Section 1) and product liability framework specifically to enable judicial oversight. Federal courts' refusal to address corporate safety would actually disrespect legislative intent by nullifying democratically enacted legal protections.

**5. No Political Decision to Adhere To**

OpenAI argues courts must defer to political branch AI decisions, but the political branches have failed to act---exactly the circumstance requiring judicial intervention. As alleged in the FAC, President Trump "explicitly revoked Biden's AI safeguards in favor of a minimal regulatory approach," Congress has failed to enact meaningful AI legislation, and international frameworks have collapsed. FAC ¶¶70-75. When political branches abdicate responsibility for addressing acknowledged catastrophic risks, judicial intervention becomes constitutionally necessary, not prohibited.

**6. No Potential for Embarrassment**

1    Hawaii's established legal frameworks prevent conflicting institutional pronouncements. Courts

2    applying Hawaii's public trust doctrine and product liability law would use the same legal

3    standards they apply to other novel technologies, ensuring consistency with judicial precedent

4    rather than creating institutional conflict.

5    **D. OpenAI's Argument Would Eliminate All Corporate Accountability**

6    OpenAI's political question interpretation would render non-justiciable virtually all corporate

7    accountability litigation. Under their logic, courts could never address:

8    • Pharmaceutical liability (involves "health policy")

9    • Automotive safety cases (involves "transportation policy")

10   • Environmental litigation (involves "environmental policy")

11   • Financial services regulation (involves "economic policy")

12   • Food safety cases (involves "agricultural policy")

13   • Workplace safety claims (involves "labor policy")

14   Every corporate safety case involves "balancing economic, technological, business, innovation,

15   and efficiency considerations against potential risks"---the exact formulation OpenAI uses to

16   claim political question immunity. If accepted, OpenAI's argument would effectively eliminate

17   the judiciary's constitutional role in corporate accountability, creating a result no court has ever

18   adopted.

19   The Supreme Court explicitly rejected such sweeping immunity arguments in *Massachusetts v.*

20   *EPA*, where it applied traditional legal analysis to novel environmental risks despite their

21   technical complexity and policy implications. 549 U.S. 497 (2007). OpenAI's argument proves

22   too much and would unconstitutionally concentrate power in political branches while eliminating

23   essential judicial oversight.

24   **E. Courts Routinely Address Novel Technologies Through Established Legal Frameworks**

25   Federal courts have consistently applied traditional legal frameworks to revolutionary

26   technologies without finding political questions:

1  • Automobile liability in the 1920s (despite massive social and economic implications)

2  • Aviation safety in the 1930s (highly technical regulatory environment)

3  • Nuclear power regulation since the 1950s (involving national security, complex

4     technology, international treaties)

5  • Internet/telecommunications since the 1990s (transformative technology with global

6     implications)

7  • Social media platforms currently (*Lemmon v. Snap*, Facebook litigation---courts apply

8     traditional tort and product liability principles)

9  None of these technologies were deemed non-justiciable despite their complexity, policy

10  implications, and societal transformation potential. AI represents the continuation of this judicial

11  tradition, not a break from it.

12  **F. This Case Is Readily Distinguished from Cousart v. OpenAI LP**

13  Defendant will likely cite *Cousart v. OpenAI LP*, 2024 WL 3282522 (N.D. Cal. May 24, 2024),

14  where a federal court dismissed a complaint against OpenAI as unsuitable for judicial resolution.

15  However, *Cousart* is readily distinguished and provides no support for Defendant's motion:

16  **1. Different Legal Standard Applied**

17  *Cousart* was decided on Rule 8 pleading standards, not political question doctrine. The court

18  found the complaint failed to state a claim because it was "riddled with rhetoric and policy

19  grievances" without factual allegations supporting legal claims. Here, Plaintiff has provided

20  extensive factual allegations about OpenAI's specific conduct, supported by the company's own

21  research, departing safety personnel statements, and authoritative economic analysis.

22  **2. Vague vs. Specific Relief Sought**

23  The *Cousart* plaintiffs sought "injunctive relief in the form of establishing 'an independent body

24  of thought leaders' to approve uses of AI products before they are deployed"—relief that was

25  inherently policy-oriented and lacked legal foundation. In contrast, Plaintiff seeks enforcement

26  of OpenAI's own abandoned safety commitments through established legal frameworks.

1  Requiring OpenAI to restore its "superalignment" initiative and safety protocols represents

2  traditional judicial enforcement of corporate accountability, not policy-making.

**3. General Grievances vs. Established Legal Framework**

*Cousart* involved general policy grievances without grounding in specific legal doctrines. This

case is anchored in Hawaii's well-established public trust doctrine, product liability law, and

public nuisance framework—all providing "judicially discoverable and manageable standards"

that defeat political question challenges.

**4. No Standing Analysis in Cousart**

*Cousart* contains no standing analysis, suggesting the plaintiffs lacked the specialized knowledge

and sustained advocacy that establish Plaintiff's particularized injury here. Plaintiff's expertise in

AI policy and concrete legislative involvement create the special injury necessary for public

interest litigation under Hawaii law.

**5. Not Precedentially Binding**

*Cousart* represents a single district court's Rule 8 analysis from another circuit and creates no

binding precedent for this Court. The decision's reasoning—that AI concerns belong in "a town

hall meeting" rather than "a court of law"—conflicts with centuries of judicial oversight of

corporate safety practices and would effectively immunize technology companies from legal

accountability.

**6. Different Factual Record**

Unlike *Cousart*'s apparent lack of concrete factual allegations, this case presents extensive

documentation of OpenAI's safety protocol abandonment, supported by the company's own

research publications, departing personnel statements, and authoritative economic impact

analysis. These factual allegations support traditional legal claims rather than general policy

grievances.

1    The *Cousart* court's statement that "the development of AI technology may well give rise to

2    grave concerns for society" actually supports Plaintiff's position—when those grave concerns

3    manifest through specific corporate conduct violating established legal duties, courts must

4    address them through traditional legal frameworks, exactly as Plaintiff requests here.

5    **G. Conclusion on Political Question**

6    OpenAI seeks to weaponize the political question doctrine to create unprecedented corporate

7    immunity from legal accountability. Their argument fails every element of *Baker v. Carr*

8    analysis, contradicts their CEO's public statements requesting government intervention, and

9    would eliminate centuries of judicial oversight over corporate conduct.

10   Most fundamentally, when a company's CEO signs public statements acknowledging extinction-

11   level risks and requests government action to prevent catastrophe, that company cannot claim

12   judicial enforcement of safety measures violates the political question doctrine. Having invited

13   government intervention through public statements and congressional testimony, OpenAI has

14   waived any political question defense and must accept the judicial accountability that

15   intervention requires.

16   **V. PLAINTIFF STATES VALID CLAIMS UNDER HAWAII LAW**

17   **A. Public Nuisance Claim Is Clearly Stated**

18   Defendant's public nuisance argument ignores Hawaii's broader doctrine and attempts to import

19   restrictive interpretations from other jurisdictions. Hawaii law provides a more expansive public

20   nuisance framework that readily applies to OpenAI's conduct.

21   *Littleton v. State* defined public nuisance as "unreasonable interference with a right common to

22   the general public," focusing on substantial risk to public welfare rather than geographic

23   limitations. 66 Haw. 55, 67, 656 P.2d 1336, 1344 (1982). The Hawaii Supreme Court has

24   consistently recognized that activities creating substantial risk to public welfare constitute

25   actionable public nuisances "even when the full extent of harm has not yet materialized." TRO

26   Motion, Memorandum in Support, p. 29. This broader approach differs significantly from the

1   restrictive interpretations in *Camden County* and other cases Defendant cites. Those decisions

2   involved traditional products and narrower public nuisance doctrines, while Hawaii's expansive

3   approach focuses on public welfare protection.

4   OpenAI's AI systems function as essential public infrastructure integrated into education,

5   healthcare, government services, and economic activity throughout Hawaii. FAC ¶¶50, 105. This

6   differs fundamentally from the traditional consumer products in cases Defendant cites. When AI

7   systems become integral to public infrastructure and services, their safety becomes a matter of

8   public welfare subject to public nuisance analysis. The Hawaii Supreme Court's willingness to

9   apply public trust principles to modern technological challenges (*Waiahole*, Navahine

10  Settlement) supports this broader application of public nuisance doctrine.

11  Plaintiff has alleged concrete interference with multiple public rights: economic stability,

12  accurate information (especially after removal of misinformation guardrails), cultural protection,

13  and critical infrastructure security. FAC ¶¶91-93. OpenAI's abandonment of safety measures it

14  once deemed essential creates unreasonable risk to these public rights. The timing of OpenAI's

15  safety guardrail elimination is particularly significant. FAC ¶¶47-48. Removing misinformation

16  protections classified as addressing "critical risks" for "market competitiveness" reasons creates

17  exactly the type of unreasonable prioritization of private interest over public welfare that public

18  nuisance doctrine addresses.

19  **B. Public Trust Doctrine Claims Are Properly Pleaded and Supported by Recent Hawaii**

20  **Precedent**

21  The Nāwahine Settlement resolved any questions about the scope of Hawaii's public trust

22  doctrine by establishing that courts must protect public resources from novel technological

23  threats that could cause irreversible harm to present and future generations.

24  Unlike other jurisdictions, Hawaii's public trust doctrine extends far beyond traditional natural

25  resources. The Hawaii Supreme Court's decisions establish that the doctrine "must conform to

26  changing needs and circumstances" and applies to novel threats (*Waiahole*, 2000), encompasses

27  "all public resources" and "imposes affirmative obligations on the State" (*Kelly*, 2006), and

1   requires precautionary action against technological threats to intergenerational welfare

2   (Nāwahine Settlement, 2024).

3   *Kelly v. 1250 Oceanside Partners* established that private activities with substantial public

4   impacts may be subject to public trust principles. 111 Hawai'i 205, 224, 140 P.3d 985, 1004

5   (2006). AI systems integrated into public infrastructure and essential services throughout Hawaii

6   clearly fall within this framework. *Maui v. Hawaii Wildlife Fund* confirmed that when private

7   activities threaten public trust resources, courts must evaluate compliance with public trust

8   obligations. 140 S. Ct. 1462 (2020). OpenAI's abandonment of safety measures creates exactly

9   this type of threat to public resources.

10  While Defendant correctly notes that public trust claims typically run against government

11  entities, multiple bases establish state action here. Government entities throughout Hawaii use

12  OpenAI's systems (FAC ¶50), creating direct state action in the deployment of potentially unsafe

13  AI systems. The state's allowing unregulated deployment of AI systems that threaten public trust

14  resources violates Hawaii's affirmative constitutional obligations under Article XI, Section 1.

15  The Nāwahine precedent established that state failure to protect against technological threats to

16  public welfare constitutes a public trust violation, even when the immediate threat comes from

17  private actors.

18  The 2024 settlement established that Hawaii courts must apply public trust principles to protect

19  against technological threats that could cause irreversible harm to future generations. FAC

20  ¶¶101-104. This precedent directly supports applying public trust analysis to AI systems where

21  industry leaders acknowledge existential risks (FAC ¶¶23-32), OpenAI's own research confirms

22  dangerous capabilities (FAC ¶¶45-46), and the company has abandoned safety measures it

23  previously deemed essential (FAC ¶¶34-48). Hawaii's public trust doctrine, as confirmed by the

24  Nāwahine Settlement, provides clear legal standards for evaluating OpenAI's conduct without

25  requiring the complex federal constitutional analysis that might face political question challenges

26  in other jurisdictions.

27  **C. Product Liability Claims Properly Allege Cognizable Injury**

1   Defendant's product liability argument incorrectly assumes that only completed physical injury

2   supports these claims. Hawaii product liability law recognizes economic harm and increased risk

3   as cognizable injuries, and Plaintiff has alleged both imminent economic displacement and

4   concrete harms from OpenAI's design choices.

5   Hawaii product liability law does not require completed physical injury. Economic harm from

6   defective products constitutes cognizable injury under *Tabieros* and *Acoba*. Plaintiff has alleged

7   concrete economic harms through the Goldman Sachs analysis showing 300 million jobs

8   globally at risk, with professional services facing 35-46% automation risk, and Amodei's

9   warnings of 50% entry-level white-collar job elimination. FAC ¶¶52-53, 120. The authoritative

10  economic analysis from Goldman Sachs and industry leaders provides quantifiable economic

11  injury different from speculative future harm. This documented economic impact supports

12  product liability claims without requiring completed physical injury.

13  Plaintiff has alleged specific design defects through OpenAI's systematic abandonment of safety

14  features: elimination of 25% computational resource commitment to safety research (FAC ¶34),

15  removal of safety-focused board oversight (FAC ¶¶35-42), elimination of misinformation

16  guardrails classified as "critical risk" protections (FAC ¶¶47-48), and design features maximizing

17  user engagement and dependency (FAC ¶¶115-116). These allegations satisfy *Acoba*'s standard

18  that products are defectively designed when "the benefits of the challenged design do not

19  outweigh the risk of danger inherent in the design." 92 Hawai'i 1, 17, 986 P.2d 288, 304 (1999).

20  OpenAI's failure to warn claims are supported by specific failures to disclose known risks that

21  the company's own research identified. FAC ¶¶124-126. OpenAI's March 2025 research

22  acknowledging systems can "hide their intent while continuing to misbehave," combined with

23  their April 2025 elimination of safety guardrails, demonstrates knowledge of risks that were not

24  adequately disclosed to users. The *Lemmon v. Snap* precedent Defendant cites actually supports

25  Plaintiff's position, confirming that technology platforms can be held liable for design defects

26  creating foreseeable risks. 995 F.3d 1085 (9th Cir. 2021).

27

28

1    **VI. THE *CHATMAN* PRECEDENT STRONGLY SUPPORTS PLAINTIFF**

2    This Court's demonstrated approach to institutional accountability cases provides strong support

3    for Plaintiff's claims. Judge Otake's *Chatman v. Otani* decision offers direct precedent for the

4    legal analysis required here, while her broader judicial philosophy emphasizes evidence-based

5    evaluation of institutional safety compliance.

6    The factual and legal parallels between this Court's decision in *Chatman v. Otani*, Civil No. 21-

7    00268 JAO-KJM (D. Haw. July 13, 2021), and this case are striking. In *Chatman*, this Court

8    found the Hawaii Department of Public Safety showed "complete disregard for the Response

9    Plan," noting "There is almost no clearer an example of complete disregard for the Response

10   Plan and abandonment of precautionary measures to prevent the spread of COVID-19 between

11   DPS facilities and islands." Here, OpenAI similarly abandoned its superalignment initiative and

12   safety commitments.

13   The *Chatman* Court identified "objective deliberate indifference" through systematic violation

14   patterns and found that "the mere existence of policies is of little value if implementation and

15   compliance are lacking." OpenAI's timeline shows identical systematic safety abandonment. The

16   Court emphasized that "The evidence before the Court demonstrates that Defendant has not

17   taken reasonable available measures to abate the risks caused by the foregoing conditions,

18   knowing full well---based on multiple prior outbreaks---that serious consequences and harm

19   would likely result." OpenAI's own research contradicts their safety assurances.

20   The Court granted preliminary injunction ordering compliance with existing safety protocols and

21   established ongoing monitoring through monthly status conferences. Plaintiff seeks identical

22   relief requiring OpenAI to restore abandoned safety measures. The *Chatman* Court found inmate

23   and staff testimony credible while rejecting government claims of adequate compliance, asking

24   "What motive do these inmates have to fabricate?" Here, OpenAI's own researchers have

25   contradicted company safety claims through their departures and public statements.

26   Judge Otake's Hawaiian Airlines decision demonstrated probing examination of corporate

27   compliance procedures, asking whether the company engaged in required "interactive process"

28   with stakeholders and questioning corporate claims about accommodation availability. This

approach directly applies to examining OpenAI's stakeholder engagement and safety procedure abandonment. The Court's emphasis on examining whether institutions actually follow their stated procedures, rather than accepting claims of compliance at face value, directly supports Plaintiff's allegations about OpenAI's departure from announced safety commitments.

This Court's consistent emphasis on comprehensive factual analysis ("The evidence before the Court demonstrates") supports allowing discovery to develop the factual record of OpenAI's safety protocol abandonment rather than dismissing based on Defendant's characterizations of their conduct. In *Chatman*, this Court issued a detailed 69-page order examining extensive factual evidence, conducting credibility determinations, and connecting individual incidents to broader institutional patterns. This analytical approach strongly supports allowing this case to proceed to discovery where the timeline and motivations behind OpenAI's safety decisions can be fully examined.

## VII. DISMISSAL WITH PREJUDICE IS INAPPROPRIATE

Even if this Court finds technical deficiencies in Plaintiff's pleadings, dismissal should be without prejudice to allow amendment. This case presents novel legal questions requiring judicial development, and the factual record would benefit from discovery of OpenAI's internal decision-making processes.

Federal courts regularly allow amendment in cases involving novel legal theories applied to emerging technologies. Judge Otake's approach in *Chatman*, favoring comprehensive factual development and detailed evidentiary analysis, supports allowing the case to proceed rather than dismissing based on legal theories that may be clarified through factual discovery. The institutional accountability issues presented here are precisely the type this Court has demonstrated expertise in addressing through careful factual analysis and evidence-based legal conclusions. The *Chatman* decision's emphasis on examining actual institutional conduct rather than stated policies supports developing a full factual record of OpenAI's safety abandonment.

1    **VIII. CONCLUSION**

2    Hawaii courts have already established the legal framework needed to address OpenAI's conduct.

3    The 2024 Nāwahine Settlement, Hawaii's uniquely expansive public trust doctrine, and this

4    Court's institutional accountability precedents provide clear legal pathways that avoid the federal

5    constitutional complexities Defendant highlights.

6    The Nāwahine Settlement provides direct precedent for applying Hawaii's public trust doctrine to

7    prevent irreversible harm from novel technological threats. That landmark case established that

8    Hawaii courts must act before catastrophic damage occurs when facing emerging threats with

9    potentially irreversible consequences---exactly the situation presented by OpenAI's abandonment

10   of safety measures for increasingly powerful AI systems.

11   OpenAI's systematic dismantling of safety commitments---documented through the company's

12   own research (FAC Exhibit I) and the public statements of departing safety researchers (FAC

13   Exhibits F-G)---presents the identical institutional accountability issue that Hawaii courts have

14   consistently addressed. Just as the Nāwahine court applied precautionary principles to climate

15   threats, this Court should apply those same principles to AI threats where OpenAI's own

16   leadership has compared risks to "pandemics and nuclear war."

17   Most importantly, this case advances Hawaii's established role as a national leader in applying

18   constitutional principles to protect present and future generations from emerging technological

19   risks. The Nāwahine Settlement precedent and Hawaii's expansive public trust doctrine provide

20   the legal foundation for judicial intervention that would be unavailable in other jurisdictions.

21   Hawaii law provides clear answers to the questions Defendant claims are unanswerable. The

22   public trust doctrine offers manageable legal standards, the Nāwahine Settlement establishes

23   direct precedent for precautionary judicial action, and Hawaii's constitutional framework

24   mandates protection of resources for present and future generations.

25   The motion should be denied in its entirety, allowing this case to proceed to the factual

26   development that will demonstrate both the strength of Plaintiff's claims under established

1   Hawaii law and the necessity of judicial intervention to protect Hawaii residents from the

2   consequences of OpenAI's safety protocol abandonment.

3   Respectfully submitted,

4

5   **Tamlyn Hunt, J.D.**

6   Plaintiff, Pro Se

7   Phone: 805-705-1352

8   Email: Tam@communityrenewables.biz

9