IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TAMLYN HUNT, J.D.,<br><br>Plaintiff,<br><br>vs.<br><br>OPENAI, INC. a Delaware Corporation,<br><br>Defendant. | CIV. NO. 25-00191 JAO-KJM<br><br>ORDER GRANTING DEFENDANT OPENAI, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (ECF NO. 42) AND DENYING AS MOOT PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 37) |

**ORDER GRANTING DEFENDANT OPENAI, INC.'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (ECF NO. 42) AND DENYING AS MOOT PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 37)**

Pro se Plaintiff Tamlyn Hunt, J.D. ("Plaintiff" or "Hunt") brings this suit to enjoin Defendant OpenAI, Inc.[1] ("Defendant" or "OpenAI") from making its products and services available in Hawai‘i until it implements certain safety measures. OpenAI moves to dismiss all claims against it under Rules 12(b)(1) and

[1] OpenAI, Inc. is now known as OpenAI Foundation. *See* ECF No. 48.

12(b)(6) of the Federal Rules of Civil Procedure ("Motion to Dismiss"). For the following reasons, the Court GRANTS OpenAI's Motion to Dismiss without leave to amend. The Court further DENIES Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion") as MOOT.

## I. BACKGROUND

### A. The Second Amended Complaint's Allegations

Pro se Plaintiff Hunt's factual allegations in his Second Amended Complaint ("SAC")[2] are essentially the same as in his First Amended Complaint ("FAC"). In his SAC, Hunt alleges that he is "a Hawaii resident, AI policy advisor to government entities, and attorney who has directly witnessed the harmful effects of OpenAI's products." ECF No. 38 ¶ 4. Plaintiff initiated this suit against OpenAI to obtain "injunctive relief requiring Defendant to implement basic safety measures before deploying increasingly powerful AI systems in Hawaii, and to provide the transparent information necessary for effective policy guidance." *Id.*

Plaintiff explains how OpenAI uses and develops sophisticated artificial intelligence ("AI") systems that "can perform a wide range of cognitive tasks at or above human levels." *See id.* ¶ 56. Plaintiff details how AI experts and industry

---

[2] The operative SAC, ECF No. 38, revised an earlier version Plaintiff filed, *see* ECF No. 42-1 n.2. It appears to correct an error in the table of contents. *Compare* ECF No. 38 at 2 ("Count I: Public Nuisance"), *with* ECF No. 35 at 2 ("Count I: Negligence").

leaders, including OpenAI leadership, have warned about the risks posed by advanced AI. *See id.* ¶¶ 39–43, 49, 57–66. According to Plaintiff, "[d]espite acknowledging the extreme risks posed by its products, OpenAI has accelerated its development and deployment of increasingly capable AI systems while simultaneously reducing its safety measures and transparency." *Id.* ¶ 67.

Plaintiff's SAC, like his FAC, avers that OpenAI's products and services are widely used in Hawai'i and that the state's "geographic isolation, unique cultural heritage, and specialized economy make it particularly vulnerable to AI-related disruptions." *See id.* ¶¶ 90–91. Plaintiff says that, "[r]ecent economic analyses indicate that a significant fraction of Hawaii's professional services jobs could face significant disruption or elimination due to advanced AI systems." *Id.* ¶ 92. He alleges that the state's tourism industry, small businesses, and critical infrastructure face potential challenges, and that AI systems "may misappropriate and misrepresent Hawaii cultural knowledge, practices, and language." *See id.* ¶¶ 93–94, 96–99, 100–03. Finally, Plaintiff contends that Hawaii's democratic processes may be compromised by AI, *id.* ¶¶ 104–06, and AI systems "have the potential to exacerbate existing inequalities in access to education, healthcare, and economic opportunities." *See id.* ¶ 107.

As with his FAC, Plaintiff alleges in his SAC that federal and international regulatory efforts "have proven woefully inadequate to address the rapidly

accelerating risks," *id.* ¶ 108, highlighting Congress's failure to enact meaningful AI safety legislation, *see id.* ¶ 110. Plaintiff also chronicles his unsuccessful efforts to introduce safety legislation at the state level. *See id.* ¶¶ 112–19. Plaintiff claims that, because of "the inadequacy of federal and international regulatory responses and the failure of legislative solutions at the state level, judicial intervention has become necessary to protect Hawaii's residents and resources from potentially irreversible harm." *Id.* ¶ 14.

As far as the Court can discern, the only meaningful difference between Plaintiff's prior FAC and his current SAC is that Plaintiff now posits four alternative bases for Article III standing. *See id.* ¶ 5. Plaintiff's first theory is he "faces imminent risk of catastrophic harm from Defendant's accelerating development toward [artificial general intelligence] without adequate safety measures." *Id.* ¶ 6. Plaintiff claims that "Hawaii's unique geographic isolation . . . creates particularized vulnerability that distinguishes Plaintiff from mainland residents." *Id.*

Plaintiff's second theory of Article III standing is that he "suffered concrete economic harm when a client relationship [was] terminated due to ChatGPT-induced cognitive deterioration." *Id.* ¶ 7. Plaintiff allegedly represented a client who sought remedies against Defendant for "ChatGPT-related injuries." *Id.* According to Plaintiff, the client suffered "progressive psychological deterioration

correlating with intensive ChatGPT use," leading to termination of the attorney-client relationship, and in turn "caus[ing] direct economic loss from unpaid professional time, lost future fees, potential professional liability exposure, and disruption to Plaintiff's legal practice[.]" *Id.*

Plaintiff's third theory is that, because he "serves as an AI policy advisor," Defendant's "refusal to provide transparent information about AI capabilities and risks while abandoning safety measures" creates a concrete informational injury sufficient to confer Article III standing. *Id.* ¶ 8. According to Plaintiff, "[e]very day that OpenAI operates without implementing promised safety measures while hiding its systems' true capabilities prevents Plaintiff from providing accurate, informed guidance to policymakers and organizations." *Id.* ¶ 21.

Plaintiff's fourth and final theory of standing is virtually indistinguishable from the first; he alleges that his "residence in Hawaii creates particularized injury . . . distinct from mainland residents" because of geographic factors that make Hawaii residents uniquely vulnerable to "catastrophic AI failures or misuse." *Id.* ¶ 9.

Invoking the Court's diversity jurisdiction, Plaintiff brings four causes of action against OpenAI: (1) public nuisance (Count I); (2) design defect product

liability (Count III); (3) failure to warn product liability (Count IV); and (4) negligent design (Count V).[3] *See id.* at 31–36.

Plaintiff seeks injunctive relief and requests that the Court "prohibit[] OpenAI from deploying new AI models in Hawaii without safety certification." *See id.* at 36. Plaintiff further asks the Court to, among other things, require OpenAI to allocate a percentage of its resources to safety research, provide certain warnings, submit to independent safety auditing, conduct Hawaiʻi-specific impact assessments, and provide transparency about system capabilities. *See id.* at 37.

**B. Procedural History**

Plaintiff filed his original complaint on May 6, 2025. *See* ECF No. 1. Two weeks later, on May 22, Plaintiff filed his FAC. ECF No. 10. Defendant moved to dismiss the FAC, ECF No. 14, which the Court granted because Plaintiff had not adequately demonstrated that he had standing to bring his claims, ECF No. 33. In its order dismissing the FAC ("Prior Order"), the Court explained that it was granting leave to amend most of Plaintiff's counts but cautioned that failure to adequately allege standing in any amended complaint could result in dismissal without leave to amend. *See id.* at 15.

[3] Count II was dismissed without leave to amend. *See* ECF No. 33 at 16.

On October 8, Plaintiff filed a Second Amended Complaint and his TRO Motion. ECF Nos. 35, 37. The following day, Plaintiff filed the operative SAC. ECF No. 38; *see supra* n.1. On October 20, Defendant filed its Motion to Dismiss. ECF No. 42. Plaintiff opposed the Motion, ECF No. 46, and Defendant filed a response, ECF No. 47.

The Court elects to decide the Motion without a hearing. *See* LR7.1.

## II. LEGAL STANDARD

Rule 12(b)(1) motions challenge the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts are presumed to lack subject matter jurisdiction, and the plaintiff bears the burden of establishing that jurisdiction is proper. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Dismissal under Rule 12(b)(1) is warranted when the plaintiff fails to meet this burden. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

Standing is a threshold matter central to federal courts' subject matter jurisdiction. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter

jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

## III. DISCUSSION

### A. Standing

Defendant argues that the SAC, like its predecessor, fails to demonstrate that Plaintiff has standing to pursue his claims. *See* ECF No. 42-1 at 14. The Court agrees.

To establish standing, a plaintiff must demonstrate that: (1) the plaintiff suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is fairly traceable to defendant's conduct; and (3) the injury can be redressed through adjudication. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The "threatened injury must *be certainly impending*" and "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal brackets omitted). Additionally, the injury must be "concrete," meaning that the harm must be "real" and "not abstract," *see Spokeo*, 578 U.S. at 354, and "particularized," meaning that it "must affect the plaintiff in a personal and individual way and not be a

generalized grievance," *see Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (internal quotation marks omitted). This requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection" and "prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." *See id.* at 381–82.

For the reasons discussed below, each of Plaintiff's theories of standing fail.

**1. Plaintiff's "Primary" Theory of Standing**

Plaintiff's foremost theory of standing is "the imminent risk of catastrophic harm" theory, which also served as his basis for standing in his FAC. *See* ECF No. 38 ¶ 10. In its Prior Order, the Court explained why Plaintiff's FAC failed to demonstrate Article III standing, starting with Plaintiff's failure to adequately allege that he suffered an actual injury or will suffer an imminent injury:

> Plaintiff's FAC merely alleges *possible* future harms that are simply too speculative to satisfy the requirement that threatened injury be "certainly impending." *See Clapper*, 568 U.S. at 409–10[.] . . . [Plaintiff's] purported future harms are conclusory allegations premised "on a highly attenuated chain of possibilities" and are therefore insufficient to establish standing. [*Id.*] at 410[.] . . . And each of [Plaintiff's] economic and social harms alleged are too "general or amorphous" to be concrete. *See Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir. 1989)[.]

ECF No. 33 at 9–10. Here, too, Plaintiff's SAC still merely alleges speculative and amorphous future harms. *See, e.g.*, ECF No. 38 ¶ 92 ("[A] significant fraction of Hawaii's professional services jobs *could* face significant disruption or

elimination due to advanced AI systems." (emphasis added)); *id.* ¶ 93 ("The state's tourism industry . . . faces *potential* disruption through AI-driven automation[.]" (emphasis added)); *id.* ¶ 95 ("[E]conomic disruption without adequate transition planning *could* exacerbate existing socioeconomic inequalities[.]" (emphasis added)); *id.* ¶ 96 ("Hawaii's unique cultural heritage faces distinct threats from advanced AI systems, including the risk that AI systems . . . *may* misappropriate and misrepresent Hawaiian cultural knowledge, practices, and language." (emphasis added)); *id.* ¶ 97 ("The Hawaiian language . . . *could* face new challenges[.]" (emphasis added)); *id.* ¶ 99 ("Cultural practices protected under Hawaii state law . . . *may* be inadequately respected[.]" (emphasis added)); *id.* ¶ 100 ("Hawaii's critical infrastructure faces unique vulnerabilities . . . that *could* be caused by increasingly capable AI systems[.]" (emphasis added)); *id.* ¶ 101 ("[A]pproximately 90% of Hawaii's energy [is] still derived from imported petroleum products managed through digital systems *potentially* vulnerable to advanced AI manipulation."); *id.* ¶ 103 ("Hawaii's strategic military importance introduces additional security considerations regarding AI systems that *might* impact defense-related infrastructure." (emphasis added)); *id.* ¶ 104 ("The social welfare and governance concerns include the *potential* for increasingly capable AI systems to generate information specifically targeted to Hawaii's distinct political

and social context, *potentially* exacerbating existing tensions around land use, sovereignty issues, and resource allocation." (emphases added)).

Plaintiff contends that Defendant (and the Court) have wrongly applied the "certainly impending" standard, which he argues is reserved for damages claims for past injuries and not for claims for injunctive relief; instead, Plaintiff insists he need only show that the future harm is "sufficiently imminent and substantial" because he only seeks injunctive relief. *See* ECF No. 46 at 5 (citing *Clapper*, 568 U.S. at 409 for proposition that "certainly impending" standard applies to damages claims and *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021), for the proposition that the "sufficiently imminent and substantial" standard is different and applies to claims for injunctive relief). But Plaintiff's argument draws a distinction between "certainly impending" and "sufficiently imminent and substantial" where there isn't much of one. Both derive from the "imminence" requirement and apply to claims for injunctive relief. *See Clapper*, 568 U.S. at 409 (concluding that plaintiffs failed to demonstrate that purported future injury was certainly impending); *see also TransUnion*, 594 U.S. at 435–36 (citing *Clapper* for the proposition that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial").

Even if there were a distinction between "certainly impending" and "sufficiently imminent and substantial," Plaintiff still falls short of the latter standard. As explained above, Plaintiff can only speculate as to what kinds of harms Hawaii's economy and infrastructure will face. *See Clapper*, 568 U.S. at 415 n.5 ("But to the extent that the 'substantial risk' standard is relevant and is distinct from the 'clearly impending' requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here.").

Plaintiff maintains that, when Defendant's leadership openly acknowledges to Congress and the public that AI technology "'can go quite wrong,' the risk is not speculative[.]" ECF No. 46 at 5–6. According to Plaintiff, "[e]ither the risks are real (establishing standing) or OpenAI misled Congress and the public[.]" *Id.* at 6. But Plaintiff fails to appreciate that even that statement itself—that AI technology can go quite wrong—is inherently speculative, vague, and rests "on a highly attenuated chain of possibilities." *See Clapper*, 568 U.S. at 410, 414 n.5. Underscoring this is Plaintiff's claim that OpenAI's CEO compared AI's risks of causing extinction to nuclear war. *See* ECF No. 46 at 5. While nuclear war is undeniably not beyond the realm of possibility, it stretches credulity to say nuclear war is "sufficiently imminent" or "certainly impending." Likewise, while it is possible that AI could cause the catastrophic harms Plaintiff fears, the mere

*possibility* of harm—even if acknowledged by Defendant—does not equate to the imminent threat, or sufficient likelihood, of harm. *See Clapper*, 568 U.S. at 432–33.

Nor has Plaintiff sufficiently alleged how AI's catastrophic risks to the state would affect him in a "personal and individual way." *See All. for Hippocratic Medicine,* 602 U.S. at 381. In its Prior Order, the Court explained that Plaintiff had not sufficiently alleged particularization:

> Plaintiff makes broad allegations about AI's risk to Hawaii's economic, cultural, and social well-being, but *fails to show how these risks would impact him differently from how other Hawai'i residents would be affected.*
>
> * * *
>
> Rather than demonstrating a personal stake in the outcome of the controversy, Plaintiff raises only general moral and policy concerns regarding the way AI has been developed and regulated—the type of "value interests" that federal standing requirements are designed to screen out. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. at 381–82; *see also Cousart v. OpenAI LP*, 2024 WL 3282522, at *1 (N.D. Cal. May 24, 2024) (dismissing plaintiffs' complaint about AI's risks to humanity where plaintiffs included "policy grievances that are not suitable for resolution by federal courts" and explaining that while "[t]he development of AI technology may well give rise to grave concerns for society, . . . the plaintiffs need to understand that they are in a court of law, not a town hall meeting.").

ECF No. 33 at 10–12 (emphasis added). Instead of remedying these deficiencies, Plaintiff doubles down on his original theory of standing and argues that "Hawaii's unique characteristics create particular vulnerability to AI risks" and that "[t]his geographic particularization distinguishes Plaintiff's injury from generalized

grievances and establishes the concrete, particularized injury required for standing." ECF No. 46 at 7. But the Court has already explained why this theory of standing is inadequate—Plaintiff must show how any purported harms "would impact *him* differently from how other Hawai‘i residents would be affected." *See* ECF No. 33 at 11 (emphasis added). Plaintiff does not do so here.

Defendant also argues that OpenAI cannot establish that the purported harms to Hawai‘i will be redressed by the injunctive relief Plaintiff seeks. *See* ECF No. 42-1 at 15. In its Prior Order dismissing Plaintiff's FAC, the Court noted that Plaintiff "has not explained how these problems would be redressed by an order enjoining OpenAI from making its products and services available within Hawai‘i, especially when other similar companies with comparable AI systems could continue operating here." ECF No. 33 at 13. Plaintiff offers no explanation in his SAC or opposition. *See generally* ECF Nos. 38, 46. Instead, Plaintiff boldly asserts, without citation, that "should the Court be concerned about singling out OpenAI for injunctive relief, the Court has authority under its equitable powers to establish comprehensive safety standards applicable to all AI chatbot systems operating in Hawaii with comparable capabilities." ECF No. 38 at 19. The Court, however, is aware of no such equitable powers. *See Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("A federal court may issue an injunction if it has

personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court.").

**2. Plaintiff's Alternative Theories of Standing**

Plaintiff for the most part does not respond to the arguments made in Defendant's Motion but instead parrots the alternative theories of standing presented in his SAC. *See* ECF No. 46 at 5–8. One such theory is that he "suffered concrete economic injury through the loss of his attorney-client relationship with his client, arguably caused by ChatGPT-induced cognitive deterioration" and that "[t]his economic injury alone establishes Article III standing." ECF No. 46 at 6. While economic injury is indeed particularized and more concrete than the other generalized risks he alleges, Plaintiff's requested relief would not redress Plaintiff's economic losses. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 128 (1983) (explaining that "whether a plaintiff has a sufficient personal stake in the outcome of a controversy" sufficient to confer standing depends on "whether plaintiff's injury is likely to be redressed by a favorable decision." (internal quotation marks omitted)). That relief includes, for example, an injunction preventing OpenAI from making its products available in Hawai'i until it provides the warnings and conducts the audits, research, and testing Plaintiff requests. How that relief redresses his client loss is unclear at best.

Plaintiff's remaining theory of standing—that "OpenAI's refusal to provide transparent information about system capabilities directly impairs Plaintiff's ability to" advise legislators and otherwise "[f]ulfill his professional role as AI safety advocate" and as the state's "foremost AI policy expert"—similarly cannot succeed. *See* ECF No. 46 at 7. Plaintiff's allegations about OpenAI's failure to provide certain information are untethered from any of his claims, all of which allege public nuisance or product liability. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotations omitted)). And in any event, Plaintiff's reliance on *FEC v. Akins*, 524 U.S. 11 (1998) is misplaced. There, the Supreme Court explained that Congress has the power to create a statutory right to information and that denial of such information can serve as a sufficient Article III injury. *See id.* at 20. But Plaintiff does not allege that he has a statutory right to the information he claims has been withheld—indeed, he cites no such statute.

Ultimately, Plaintiff is unsatisfied with Congress' and the state's regulation of AI, and turns to the Court to address the perceived "regulatory vacuum." *See* ECF No. 38 ¶¶ 111, 118; *see also id.* ¶ 119 ("[L]egislative failure, combined with federal inaction and the collapse of international governance efforts, has left judicial intervention as the only remaining avenue to protect Hawaii residents from

the acknowledged catastrophic risks of uncontrolled AGI development.”). But it simply is not the province of the judiciary to fill that gap and usurp the legislative role. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 223 (1983) (“The courts should not assume the role which our system assigns to Congress.”). Plaintiff's attempt to craft a theory of standing that is both concrete and particularized and that works with his alleged claims and the relief he seeks fails in large part because Plaintiff is trying to fit a square peg into a round hole: instead of asking the Court to decide a concrete case or controversy, Plaintiff tries to use the Court to adopt the sweeping regulations he seeks. And it is precisely because Plaintiff has not presented the Court with a justiciable case that it must dismiss this suit.[4]

**B. Leave to Amend**

Dismissal should be with leave to amend “unless it is clear . . . that the complaint could not be saved by any amendment.” *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 655–56 (9th Cir. 2017) (quoting *Thinket Ink Info Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004)). But a district court may dismiss without leave to amend when amendment would be “futile.” *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

---

[4] Because the Court concludes that Plaintiffs lack standing, the Court will not reach Defendant's political question doctrine and Rule 12(b)(6) arguments.

In its Prior Order, the Court noted that, because Plaintiff is an attorney, his allegations are construed in the same manner as if he were represented, *see* ECF No. 33 at 14–15 (citing *Huffman v. Lindgren*, 81 F.4th 1016, 1019 (9th Cir. 2023)), and that "[f]ailure to adequately allege standing in any Second Amended Complaint may result in a conclusion that further amendment would be futile*," see id.* at 15. Given that Plaintiff has now had multiple opportunities to amend his allegations, the Court concludes that further amendment would be futile and dismisses Plaintiff's SAC without leave to amend.

**C. Plaintiff's TRO Motion**

Because the Court dismisses Plaintiff's SAC in its entirety, the Court DENIES Plaintiff's TRO Motion as MOOT. *See*, *e.g.*, *Amsterdam v. Abercrombie*, 2013 WL 6198183, at *3 (D. Haw. Nov. 26, 2013) (dismissing all pending motions as moot after dismissing complaint).

## IV. CONCLUSION

For the reasons stated above, the Court orders as follows:

1. The Court GRANTS Defendant OpenAI's Motion to Dismiss (ECF No. 42) without leave to amend.

2. The Court DENIES Plaintiff Hunt's TRO Motion (ECF No. 37) as MOOT.

3. The Clerk of Court is directed to close the case file and terminate the case.

IT IS SO ORDERED.

DATED: Honolulu, Hawai‘i, December 22, 2025.

Jill A. Otake
United States District Judge

CIV. NO. 25-00191 JAO-KJM, *Hunt v. OpenAI, Inc.*; ORDER GRANTING DEFENDANT OPENAI, INC.’S MOTION TO DISMISS SECOND AMENDED COMPLAINT (ECF NO. 42) AND DENYING AS MOOT PLAINTIFF’S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 37)